# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

Minnesota Auto Dealers Association,

                Plaintiff,

v.

State of Minnesota, by and through the
Minnesota Pollution Control Agency and
the Minnesota Pollution Control Agency
Commissioner Laura Bishop,

                Defendants.

Civil File No. _____

**COMPLAINT**

Plaintiff Minnesota Automobile Dealers Association ("MADA"), for its Complaint against the State of Minnesota, by and through the Minnesota Pollution Control Agency ("MPCA"), and MPCA Commissioner Laura Bishop, in her official capacity, states and alleges as follows:

## NATURE OF THE ACTION

1.　　This is a civil action to enjoin MPCA from rulemaking to establish greenhouse gas ("GHG") emissions standards for new motor vehicles and impose quotas for zero-emission vehicle sales because the proposed rules are expressly preempted by federal law.

2.　　The Minnesota Clean Car Rules ("MCCR") would impose California vehicle emission standards on all motor vehicles sold in Minnesota beginning in model year 2025. The challenged standards, which the MCCR incorporates by reference, are (1) California's

"LEV III" standards for GHG emissions, which require both that each vehicle be certified as emitting only a certain level of various GHGs (a so-called "California car") and that manufacturers meet a fleet-wide standard for average emissions; and (2) California's technology-forcing mandate establishing manufacturer quotas for delivery of Zero Emission Vehicles (ZEVs).

3.      The federal Clean Air Act ("CAA") regulates emissions from new motor vehicles. 42 U.S.C. ch. 85, subch. II, parts A &C; 42 U.S.C §§ 7521–7554, 7581–7590. The CAA prohibits any state from adopting new motor vehicle or new motor vehicle engine emission standards that differ from those established under the CAA. 42 U.S.C. § 7543(a) ("Section 209"). EPA may waive the express preemption of state regulations only for the State of California, Section 209(b)(1), or for states that meet certain criteria and adopt California's standards, 42 U.S.C. § 7507 ("Section 177"). EPA has revoked the waiver previously issued to California for GHG emissions and the ZEV mandate. 84 Fed. Reg. 51,310 (Sept. 27, 2019).

4.      The Energy Policy and Conservation Act ("EPCA") charges the Secretary of Transportation, acting through NHTSA, to "prescribe by regulation average fuel economy standards for automobiles." 49 U.S.C. § 32902(a); *see also* 49 C.F.R. pts 531 & 532 (NHTSA passenger automobile average fuel economy standards for passenger automobile vehicles and light trucks, respectively). NHTSA has determined that EPCA preempts state regulations of GHG and quotas of ZEVs. 84 Fed. Reg. 51,310 (Sept. 27, 2019).

5.      These two federal laws preempt Minnesota's proposed rulemaking.

6.     On December 21, 2020, the State of Minnesota, acting through MPCA, issued a Notice of Intent to Adopt a Rule, Notice of Hearing, and a Statement of Need and Reasonableness ("SONAR") for the MCCR. (*See* SONAR excerpts attached as Ex. A.)

7.     MPCA is planning to hold online information sessions on January 19, 20 and 27, 2021, and February 2, 2021. (MPCA, News Release, *Minnesota drives forward with clean car standards to reduce greenhouse gas emissions* (Dec. 18, 2020), attached hereto as Ex. B.)  MPCA is also planning to hold formal public hearings on the proposed rules on February 22 and 23, 2021. (*Id*.)

8.     MPCA claims legal authority to adopt California's GHG emission standards and ZEV mandate under CAA Section 177 and under Minn. Stat. § 116.07, subd. 2(a), which directs MPCA to adopt "maximum allowable standards of emission of air contaminants from motor vehicles." This claim is erroneous. The CAA waiver has been revoked and the relevant portion of Minn. Stat. § 116.07, subd. 2(a) has been expressly preempted by CAA Section 209 since the latter's adoption in 1967.

9.     In the SONAR, MPCA admits that the rule making process is "unusual" because the proposed rule cannot take effect until three things happen: (1) the federal litigation over California's CAA waiver is resolved, (2) EPA and NHTSA reverse course and grant California a new CAA waiver, and (3) Minnesota meets the standards in Section 177 to adopt California's rules. (Ex. A at 36–37, 52–53.) This could be at least years from now and possibly never. The rule is also unusual because even when (and if) MPCA receives authority to promulgate these rules, the rules must be identical to an existing California state standard. Hence, the Minnesota rules simply incorporate California rules

by reference (*id.* at 40), despite an admitted inability to know what the California rules will say in the future. Finally, the rule is unusual because, although the rule is dependent on multiple contingencies and cannot take effect until *at the earliest* 2025, one of the enforcement mechanisms begins *immediately*, that is, "five working days" after completion of the rulemaking process. (*Id.* at 53.) The early action credit program for ZEVs would begin with model year 2022, which means vehicles sold as soon as January 2, 2021—right now. (*See* Proposed Rule 7023.0300, subp. 4, Minn. Reg. 45 SR 666 (Dec. 21, 2020), attached as Ex. C.)

10.     Members of MADA will be forced to incur substantial economic costs and harms if Minnesota is allowed to proceed with its illegal adoption of California's motor vehicle emission standards. Under MPCA's proposed rules, manufacturers can sell only California cars in Minnesota and must ship an increasing percentage of ZEVs in accordance with the ZEV mandate. By law, auto manufacturers with existing dealership networks may only sell new motor vehicles via those dealers. If MADA members are limited to selling California cars, and forced to take delivery of an ever-increasing percentage of ZEVs, MADA members face harms including lost profits, stranded inventory, increased interest costs, increased technology costs, diminished ability to sell to neighboring states, and the complete obstruction of the interstate dealer trading system.

## PARTIES

11.     Plaintiff MADA, a Minnesota corporation, was founded in 1919 as an advocate for franchised new car and truck dealerships in Minnesota. MADA advocates for the interests of Minnesota's retail motor vehicle industry and serves as an important source

of legal, legislative and industry advocacy and information. It also provides specialized expertise, training and communications for its members. MADA's purpose is to promote the commercial and mercantile interests of the automotive industry as well as engage in any and all activities relating to the automotive industry for the benefit and protection of its members. MADA has submitted comments to MPCA regarding the agency's proposed MCCR and has met with numerous Minnesota government officials to express its members' concerns with the proposed rule. All MADA members operate their dealerships within the State of Minnesota.

12.     Defendant MPCA is the state governmental agency authorized under Minn. Stat. § 116.07, subd. 2(a) to regulate air quality within the State of Minnesota, which is also a defendant in this matter. Defendant Laura Bishop is the current Commissioner of MPCA. MPCA's headquarters are located in St. Paul, Minnesota.

## JURISDICTION AND VENUE

13.     This Complaint seeks declaratory and injunctive relief to prevent violations of MADA's federally protected rights under the United States Constitution, the CAA, and the EPCA, specifically seeking redress for the alleged deprivation, under color of state statute and regulation, of rights protected by the laws of the United States.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case presents a question arising under federal law. Minnesota's actions, through MPCA, interfere with MADA's federal rights. As explained below, the CAA and EPCA expressly preempt the proposed regulations.

15.     This Court has the authority to grant proper relief pursuant to 28 U.S.C. § 2202, including the issuance of an injunction. This Court also has the authority to issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

16.     Venue in this district is proper under 28 U.S.C. § 1391 because all the parties exist, operate, regulate or are regulated, as applicable, in this judicial district.

## STANDING

17.     MADA has an imminent, concrete and particularized injury because its members will (1) lose sales if they can stock and sell only California compliant vehicles, and (2) incur costs from stocking increased numbers of ZEVs.

18.     MADA's injury is fairly traceable to Minnesota's actions through MPCA because the MCCR forces MADA members to prepare for and attempt to sell vehicles for which there is no apparent demand and which they would not otherwise order.

19.     MADA's injury would be redressed by a favorable decision by this Court because an order preventing the rulemaking would stop the imposition of the proposed rules on MADA members.

20.     The controversy between MADA and Minnesota is ripe because Minnesota lacks the authority to engage in the proposed rulemaking. Since Minnesota lacks the authority to adopt the GHG regulations and enforce ZEV quotas, the outcome of any proposed rulemaking or period for input from stakeholders is irrelevant to determining whether there is a concrete dispute between Minnesota and MADA. The controversy concerns whether Minnesota can regulate at all, not the contents of any resulting regulations. Because MPCA has already committed to going forward with an illegal

regulatory effort, this Court need not await the inevitable outcome to determine whether the process is permitted.

21.     The controversy is also ripe because the proposed rule adopts the California regulations by reference. MPCA has no power or authority to alter the California rules prior to the proposed Minnesota enactment.

22.     Moreover, Minnesota plans to apply regulatory pressure, through its early action credit program, to achieve early compliance with the new Minnesota emission rules as soon as the rulemaking is complete—well before the rules even become officially effective—which means Minnesota will be enforcing compliance with emission rules MPCA admits, under present law, it has no authority to establish.

## FACTUAL BACKGROUND

### Federal Regulation of Motor Vehicle Emissions and Fuel Economy

23.     The CAA creates a federal system for the regulation of "emissions of any air pollutant from . . . new motor vehicles." 42 U.S.C. § 7521(a)(1). The statute tasks the EPA Administrator with establishing national limits for emitted pollutants.

24.     The CAA expressly preempts state regulation of emissions from new motor vehicles. 42 U.S.C. § 7543(a). It states, "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."

25.     The only exception to the federal regulation of emissions is when the Administrator of the EPA "waive[s] application" of the preemption provision. 42 U.S.C. § 7543(b)(1).

26.     California is the only state eligible for a waiver under Section 209 because it was the only state, as of March 30, 1966, with its own standards to control the emissions from new motor vehicles.

27.     Other states that meet certain qualifications may adopt regulations "identical to the California standards." 42 U.S.C. § 7507.

28.     The MCCR represents the first time Minnesota has attempted to use the authority granted under Section 177 to stray from the federal standards for emissions.

29.     The EPCA charges the Secretary of Transportation, acting through NHTSA, to "prescribe by regulation average fuel economy standards for automobiles." 49 U.S.C. § 32902(a); *see also* 49 C.F.R. pts 531 & 533 (NHTSA passenger automobile average fuel economy standards for passenger automobile vehicles and light trucks, respectively).

30.     The EPCA contains an express preemption provision that prohibits any state from adopting or enforcing a "law or regulation related to fuel economy standards or average fuel economy standards for automobiles…." 49 U.S.C. 32919(a); *see also* 49 CFR §§ 531.7, 533.7 (same, for passenger automobiles and light trucks, respectively). NHTSA regulations specify that any state law or regulation that has "the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919." 49 C.F.R. pt. 531, App. B(a)(3); *see also* 49 C.F.R. pt. 533, App. B(a)(3) (same).

31.     On September 27, 2019, EPA formally revoked California's CAA preemption waiver. This ended California's ability to set GHG emission standards and

impose ZEV quotas. *See* "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," 84 Fed. Reg. 51,310 (Sept. 27, 2019). That revocation was based on two independent grounds. First, EPA concluded that California's waiver application had not demonstrated that these state standards were necessary to meet "compelling and extraordinary conditions," in accordance with 42 U.S.C § 7543(b)(1)(B). *Id*. at 51,328. Second, EPA concluded that NHTSA's preemption regulation, 49 C.F.R. §§ 531.7, 533.7, clarified that EPCA preempts California's GHG standards and ZEV mandates; therefore, EPA's prior waiver of CAA preemption for those programs was no longer valid. *Id*. at 51,310. Thus, the present position of the United States is (a) no CAA waiver exists at present for the California vehicle standards MPCA proposes to adopt, and (b) even if the waiver did exist, the GHG standards and ZEV mandate would still be preempted by EPCA.

32.     The Joint Rulemaking established that there is a single national standard for GHG emissions and fuel economy, and that California's GHG rules and ZEV mandate violate that standard. *Id*.

33.     Reinstating California's CAA waiver would require a notice and comment rulemaking from both EPA and NHTSA, a process that, were it to occur, would likely take years to complete.

34.     Despite EPA's revocation of the preemption waiver for GHG standards and ZEV quotas, California continues to defy federal law and attempt to regulate emissions from new motor vehicles. On September 23, 2020, Governor Gavin Newsom signed Executive Order N-79-20, which requires California agencies to adopt the rule that *all*

passenger cars and light-duty trucks sold in California have zero emissions by 2035, and all medium- and heavy-duty trucks sold in California have zero emissions by 2045. (*See* Ex. D, Executive Order N-79-20 (Sept. 23, 2020).)

35.     MPCA proposes to incorporate California's LEV III GHG standards and ZEV mandate "as amended." (Ex. A at 49.) The result of this would be that any future amendments California makes to these GHG and ZEV regulations would automatically become Minnesota law with no involvement or prior approval by the Minnesota legislature or MPCA.

### Minnesota's Automobile Emissions Authority

36.     Minn. Stat. § 116.07, subd. 2(a), grants MPCA the authority to "adopt standards of air quality, including maximum allowable standards of emission of air contaminants from motor vehicles."

37.     CAA Section 209 expressly preempts state regulation of emissions, providing, "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to" subchapter II, Part A of the CAA. Part A establishes and governs federal motor vehicle emission and fuel standards.

38.     On or about October 7, 2019, MPCA published a Request for Comments on its proposal to adopt the MCCR. MPCA's stated purpose for adopting the new Minnesota emission rules is "to reduce greenhouse gas (GHG) and other harmful air pollutant emissions from passenger vehicles by adopting the Low-Emission Vehicles (LEV) and Zero-Emission Vehicles (ZEV) standards adopted by the California Air Resources Board,

as allowed under section 177 [42 U.S.C. § 7507] of the Clean Air Act (CAA)." (MPCA, Request for Comments at 1 (Sept. 30, 2019), attached hereto as Ex. E.)

39.    Even while drafting the new rules, MPCA was aware that it did not have authority to regulate emissions. MPCA acknowledged that moving forward with these new rules now was beyond its current authority and was "contingent on restoration of [California's] ability to adopt these measures, including the existence of operative waiver authority under Sections 209(b) and 177 of the Clean Air Act [42 U.S.C. §§ 7543(a), 7507]." (*See* Ex. E at 2; *see also* Ex. A at 36–37, 52–53 (discussing the rule's dependence on the status of California's waiver).) And if California's waiver was not restored, then MPCA "would probably have to revoke the whole rule."  (*See* February 11, 2020 email chain obtained by counsel via Minnesota Data Practices Act on April 14, 2020, attached as Ex. F.)

40.    Notwithstanding these acknowledged legal barriers, MPCA instead cites its own authority under Minn. Stat. § 116.07 as justification for adopting GHG standards for motor vehicles.

41.    MPCA's Request for Comments states the new Minnesota emission rules will consist of two components. First, the LEV standard would require automobile manufacturers to deliver for sale in Minnesota only vehicles that meet the more stringent GHG and other air pollutant emissions standards established by California's LEV III emission standards. MPCA's LEV standards would apply, with limited exceptions, to new motor vehicles that are passenger cars, light-duty trucks, medium-duty passenger vehicles,

and medium-duty vehicles, and the standards would become more stringent each year in lockstep with California's LEV III standards.

42.     Second, MPCA's proposed ZEV rule would require automobile manufacturers to deliver for sale in Minnesota a certain number of vehicles with ultra-low or zero tailpipe emissions each year, including battery electric vehicles (EVs), plug-in hybrid electric vehicles (PHEVs), and hydrogen-fueled vehicles, all of which are considered ZEVs. Under the proposed ZEV rules, manufacturers would be given ZEV credit quotas based on their average annual sales, with the quotas rising each year. Manufacturers would generate different numbers of credits for delivering different types of vehicles for sale, based on vehicle technology and maximum range per charge. Manufacturers would be able to bank credits to meet requirements in future years or to buy and sell credits amongst themselves.

43.     MPCA claimed, in its Request for Comments, "The ZEV standard would result in additional ZEVs sold in Minnesota, but does not require any individual to purchase a ZEV." (*See* Ex. E at 2.) The agency offered no evidence in support of this assertion.

44.     Even before MPCA's proposed emissions standards become effective, and before MPCA has legal authority under federal law to adopt the standards, MPCA plans to enforce compliance with the ZEV standard through an early action credit program, which will "go into effect five working days after the MPCA publishes a Notice of Adoption in the *State Register* following completion of the rulemaking process." (Ex. A at 53.)

**The MCCR Will Harm MADA Members**

45.     MADA members will suffer harm both from (1) being forced to stock ZEVs; and (2) being limited to selling only California cars.

46.     MPCA's proposed ZEV standard will cause concrete harm to MADA members in the form of direct costs, reduced access to in-demand vehicles, and lost business opportunity.

47.     MPCA's proposed ZEV standard requires that manufacturers deliver for sale or lease a certain percentage of ZEVs in Minnesota each year. The rule raises that percentage over time, requiring more ZEV deliveries every year.

48.     MPCA's proposed ZEV standard requires the share of ZEVs delivered to Minnesota dealers to match the share delivered for sale in California.

49.     MPCA estimates considerably less than 1% of cars on dealer lots are currently battery electric vehicles. (Ex. A at 49.)

50.     MPCA estimates that the proposed rules quota system would push this to 7.5% by 2025. (*Id*. at 50.)

51.     By Minnesota law, auto manufacturers with existing dealership networks may only sell new motor vehicles via those dealers. Dealers—MADA members—take "delivery" of those vehicles by purchasing the vehicles at their sole expense from the manufacturers and then bearing the responsibility for selling those motor vehicles to consumers. Thus, the only way manufacturers can meet MPCA's ZEV delivery quota— and the only way the rule can accomplish MPCA's goals—is for manufacturers to "deliver," i.e., "sell," enough ZEVs to meet their percentage quotas to MADA members.

52.     Auto dealers have finite lot space. MPCA's ZEV quota will force dealers to dedicate increased lot space to less-popular ZEVs, thereby squeezing lot space available for more popular vehicles. In Minnesota, those more popular vehicles are overwhelmingly non-ZEV, full-size pick-ups and SUVs.

53.     With more lot space dedicated to unprofitable ZEVs, and less space dedicated to profitable trucks, dealers' profits will fall and their costs will rise.

54.     Carrying the quota of ZEVs will also tie up dealer capital and financing capacity that would otherwise be spent on profitable vehicles.

55.     In addition, preparing to stock ZEVs demands an initial and ongoing capital investment. As the state acknowledges, the requirement that Minnesota dealers sell more electric cars will impose direct costs in "the necessary infrastructure and training . . . and building public awareness." (Ex. A at 59; *see also id.* at 63, 68–70.) Dealer experience with prior transitions demonstrates these costs can run from a minimum of $10,000 to well over $200,000 per model.

56.     Though MPCA asserts that the rules would affect vehicles delivered for sale no earlier than January 2, 2024 (model year 2025 vehicles), the impact of the proposed ZEV rule upon MADA members will be immediate because of the "early action credit." (*See* Ex. A. at 53.) Manufacturers start to earn ZEV credits on vehicles delivered for sale *immediately* upon the rule's enactment. The stated regulatory purpose of the early action credit mechanism is to incentivize deliveries of ZEVs to Minnesota before the eventual (possible) effective date of the ZEV quotas. (*Id.*) This means dealers will be forced to take

delivery of ZEVs—long before there is any legal authority for Minnesota to pass ZEV regulations.

57.    MADA members will bear the economic burdens and the risk of the manufacturer's compliance with the ZEV mandate. While MPCA makes an anecdotal claim of unmet consumer demand for ZEVs, the MCCR offers no relief to MADA members who, after being compelled to purchase ZEVs for their dealership fleet inventory, are then unable to sell those motor vehicles to their customers. These harms will begin even before the rule is effective through the proposed early action credit program, which will effectively compel compliance even before MPCA has authority to regulate. If dealers could sell more ZEVs, they would do so without a rule.

58.    MPCA's proposed adoption of California's LEV III GHG emission standards will also have a negative economic effect on MADA members. Minnesota will become an island of California cars in a sea of federal cars. Because California cars are invariably more expensive, Minnesota dealers will lose sales to dealers in neighboring states that can sell less expensive versions of the same models. Presently, many Minnesota dealers sell 10–20% of their cars to out-of-state residents. Those sales will effectively cease if the MCCR is adopted.

59.    Minnesota suggests the solution to these lost out-of-state sales is for dealers to keep two distinct sets of vehicle inventories available: California-compliant cars for Minnesota residents and federal cars for customers from other states. (Ex. A at 56–57, 63, 69–70.) However, the state's "solution" will only increase the injury to these dealers. In addition to effectively imposing the costs of managing and maintaining two sets of vehicle

inventory, the proposed rules will also restrict which customers can purchase from each vehicle inventory, a restriction inapplicable to competitors in neighboring states that places Minnesota dealers at a competitive disadvantage.

60.     An even more devastating effect of pushing Minnesota off the national standard will be the total obstruction of cross-border trading by dealers. In addition to the cars on their lots, car dealers serve their customers with cars they obtain from other dealers via trade. These trades are a necessity in a time when cars come with many option packages and colors. Many Minnesota dealers trade across state lines, with dealers in Iowa, Wisconsin, and the Dakotas. This is particularly true of MADA members with dealerships close to Minnesota's borders. These MADA members' businesses rely significantly upon the ability to trade in non–California certified vehicles originating in these border states. Most, if not all, MADA members make interstate trades, and many have cultivated extensive networks of partners in neighboring states.

61.     MPCA's proposed rule will make it impossible for MADA members to trade with any neighboring states because dealers in those states do not stock California cars. The closest trading partners for California cars will be located in Colorado.

62.     Dealers' transaction costs for vehicle trades consist primarily of the cost of transit, which increases dramatically with distance. For example, vehicle trades with dealers located within a distance of 300 miles—the distance of most trades at present—can be achieved by a single driver in a single day. Any trade with a Colorado dealer will require the car be moved on a trailer, increasing three-fold the cost of the trade as compared to a

trade with a closer dealer. Transit costs will increase even further for trades with dealers from farther-flung California-car states on the coasts.

63.     The agency acknowledged the potential negative effect of this rule on cross-state trading and concedes it is unable to determine the level of impact upon Minnesota dealers. (*See* Ex. A at 70.)

64.     The MCCR will generate concrete and immediate costs, lost profits, and harms to MADA members.

## CAUSES OF ACTION

### Count One

### Injunction: Preventing MPCA from Setting GHG Emission Standards and ZEV Mandates that Are Preempted by Federal Law.

65.     MADA restates and incorporates by reference the above-numbered paragraphs.

66.     42 U.S.C. § 7543(a) preempts state authority to regulate GHG emissions, declaring, "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to" subchapter II, Part A of the CAA.

67.     The proposed rule attempts to enforce standards on vehicles subject to subchapter II, Part A of the CAA.

68.     Despite Section 7543(a)'s express preemption, MPCA claims Minn. Stat. § 116.07, subd. 2(a) provides authority to adopt the MCCR.

69.     An actual controversy exists between MADA and the State of Minnesota because Minnesota, through MPCA, is illegally attempting to use its preempted authority under Minn. Stat. § 116.07, subd. 2(a) to adopt state motor vehicle emission standards that differ from those established by the federal government, in contravention of 42 U.S.C. § 7543(a) and to the detriment of MADA members.

70.     The EPCA, 49 U.S.C. 32919(a), provides that when the Secretary of the Department of Transportation prescribes an average fuel economy standard pursuant to the EPCA, states may not adopt or enforce any "law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard" adopted under the EPCA.

71.     NHTSA has adopted fuel economy standards for vehicles pursuant to the EPCA. *See* 49 C.F.R. 531.5(c).

72.     NHTSA regulations specify that any state law or regulation that has "the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919." 49 C.F.R. pt. 531, App. B(a)(3); *see also* 49 C.F.R. pt. 533, App. B(a)(3) (same).

73.     MPCA proposes to adopt California's LEV III GHG standards and ZEV mandate, each of which has "the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy."

74.     MADA seeks an injunction preventing Minnesota through MPCA from pursuing its attempt to regulate emissions from new motor vehicles because its authority is preempted by the CAA and EPCA.

## Count Two

**Declaratory Judgment: Minnesota Lacks the Authority to Regulate GHG Emissions from New Motor Vehicles and Impose ZEV Mandates**

75.     MADA restates and incorporates by reference the above numbered paragraphs.

76.     The Clean Air Act establishes federal regulation of emissions from new motor vehicles and expressly preempts state regulation of the same, unless EPA permits California to regulate emissions and other states adopt California's standards.

77.     EPA has revoked the waiver that formerly allowed California's LEV III GHG standards and ZEV mandate; as a result, the only permissible regulation of GHG emissions are the federal standards.

78.     MPCA is nonetheless illegally planning to adopt California's LEV III GHG standards and ZEV mandate.

79.     MADA seeks a declaratory judgment stating that Minnesota lacks the authority to pursue the proposed new Minnesota GHG emission rules and ZEV mandate.

## Count Three

**Declaratory Judgment: The Energy Policy and Conservation Act Preempts the MCCR**

80.     MADA restates and incorporates by reference the above-numbered paragraphs.

81.     The EPCA, 49 U.S.C. 32919(a), provides that when the Secretary of the Department of Transportation prescribes an average fuel economy standard pursuant to the EPCA, states may not adopt or enforce any "law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard" adopted under the EPCA.

82.     NHTSA has adopted fuel economy standards for vehicles pursuant to the EPCA. *See* 49 C.F.R. 531.5(c).

83.     NHTSA regulations specify that any state law or regulation that has "the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919." 49 C.F.R. pt. 531, App. B(a)(3); *see also* 49 C.F.R. pt. 533, App. B(a)(3) (same).

84.     MPCA proposes to adopt California's LEV III GHG standards and ZEV mandate, each of which has "the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy."

85.     An actual controversy exists between MADA and the defendants because Minnesota, through MPCA, is illegally attempting to adopt GHG and ZEV standards that are preempted by the EPCA, to the detriment of MADA members.

86.     MADA seeks a declaration that Minnesota cannot adopt California's GHG and ZEV standards because those standards constitute state laws or regulations that have the "direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide

emissions from automobiles or automobile fuel economy," which are preempted by the EPCA and NHTSA's regulations.

**WHEREFORE,** Plaintiff Minnesota Automobile Dealers Association requests judgment in its favor and against the State of Minnesota, through its Pollution Control Agency, awarding Minnesota Automobile Dealers Association the following:

A.    Injunctive relief prohibiting the State, through MPCA, from conducting the public hearings scheduled for February 22–23, 2021, on the MCCR and from adopting the MCCR;

B.    Declaratory judgments under the Declaratory Judgments Act, as set forth in MADA's Causes of Action;

C.    All attorney fees, costs, and expenses allowed by law;

D.    Any interest on the above-described amounts, including prejudgment interest, allowed by law; and

E.    Such other and further relief as the Court deems necessary, just, or proper.

Dated: January 6, 2021

*/s/ Byron E. Starns*
Byron E. Starns, #104486
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1516
Mobile: (612) 308-2149
byron.starns@stinson.com

Jeremy Greenhouse, #328443
THE ENVIRONMENTAL LAW
GROUP, LTD
2263 Waters Drive
Mendota Heights, MN 55120
Telephone: (612) 623-2391
jgreenhouse@envirolawgroup.com

**ATTORNEYS FOR PLAINTIFF**