## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Auto Dealers Association, | Civil File No. 21-cv-53 (WMW/ECW) |
| Plaintiff, | |
| v. | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** |
| State of Minnesota, by and through the Minnesota Pollution Control Agency and the Minnesota Pollution Control Agency Commissioner Laura Bishop, | |
| Defendants. | |

## <u>INTRODUCTION</u>

Plaintiff Minnesota Automobile Dealers Association ("MADA") seeks a preliminary injunction from this Court to prevent Minnesota and Minnesota Pollution Control Agency ("MPCA") from violating federally protected rights of MADA and its members, and from violating the Supremacy Clause, U.S. Const. art. VI, cl. 2. Each is at risk because MPCA issued a Notice of Intent to Adopt Rules for the Minnesota Clean Car Rules ("MCCR") that violate the Clean Air Act's ("CAA") and the Energy Policy and Conservation Act's ("EPCA") express preemption of state law regulation of vehicle emissions. Minnesota's authority to adopt and enforce the MCCR depends on the resolution of pending federal litigation,[1] in which Minnesota is a participant, and  new rulemaking by Environmental Protection Agency ("EPA") and National Highway Traffic Safety

---

[1] *See, e.g., California v. Wheeler*, No. 19-1230 (D.C. Cir. filed Nov. 15, 2019); *California v. Wheeler*, No. 19-1239 (D.C. Cir. filed Nov. 15, 2019).

Administration ("NHTSA").[2] MPCA proposes, nonetheless, to begin enforcing the zero-emission vehicle (ZEV) rule in 2021, five days after the completion of the rulemaking, with an "early action credit" program that incentivizes manufacturers to begin delivering ZEVs to their franchise dealers, years before the rule's ZEV mandate takes effect.[3] These ZEV deliveries will result in dealers being left with the cost of unsellable inventory, lost profits, financing costs, and physical dealership preparations. The low-emission vehicle (LEV) portion of the MCCR will result in MADA's members losing business and customers to dealers in the surrounding states. On this basis, MADA asks this Court to enjoin MPCA's public hearings scheduled for February 22 and 23, 2021, from conducting further proceedings related to adopting the MCCR, and from adopting the MCCR until there is a change in the federal regulatory landscape.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331 as there is a federal question. "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14 (1983) (citing *Ex parte Young,* 209 U.S. 123, 160–162 (1908)); *see also Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 410 (8th Cir. 1985). In particular, there is

---

[2] 84 Fed. Reg. 51,310 (Sept. 27, 2019) (announcing final EPA rule withdrawing CAA waiver for California's greenhouse gas (GHG) vehicle emission standards and ZEV mandate and final NHTSA rule determining the GHG and ZEV regulations preempted by the EPCA).

[3] "The proposed early action credit mechanism and one-time credit allotment are not emission standards, but rather *enforcement* mechanisms intended to ensure that the ZEV standard is effective in Minnesota." (Compl. Ex. A at 36.) (emphasis added).

federal question jurisdiction when a party seeks to enjoin a state actor from enforcing a preempted statutory or regulatory scheme. *Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 30 (1st Cir. 1990); *Cable Television Ass'n of New York, Inc. v. Finneran*, 954 F.2d 91, 94–95 (2d Cir. 1992); *cf. Lankford v. Sherman*, 451 F.3d 496, 500–02, 509, 513 (8th Cir. 2006). In this case, MADA is seeking to do just that: enjoin the state from creating and enforcing a new rule that directly interferes with MADA's federally protected rights under the CAA and EPCA. *Cf. Lawrence Cty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260 n.6 (1985) (noting that the Eighth Circuit was wrong to dismiss a claim of preemption under the Supremacy clause for lack of a federal question); *see also City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633, 640 (1973) (proceeding to the merits of a claim for injunctive relief and holding that the city ordinance was preempted under the Supremacy Clause).

## FACTUAL BACKGROUND

### Background on the Rulemaking

On December 21, 2020, MPCA published a Notice of Intent to Adopt Rules with Hearing to incorporate by reference California's LEV and ZEV standards. The Notice scheduled public hearings for February 22 and 23, 2021. The ZEV portion of the rule is intended to "encourage the adoption of EVs [electric vehicles] over ICE [internal combustion engine] vehicles." (Declaration of Byron E. Starns ("Starns Decl."), Ex. A at 43) (For the purposes of the proposed rule, "EV" is synonymous with "ZEV.") To accomplish this end, the rule "require[s] manufacturers to increase EV deliveries over

time." (*Id*.) At present, ZEVs compromise around 1% of the new vehicles available for sale in Minnesota. (*Id*. at 49.) MPCA projects the rule will raise the percentage of sales to 6.2–7.4% from 2025 through 2034. (*Id*. at 43.) Absent this rule, MPCA estimates ZEVs will comprise 2.9–5.8% of the market for that time period. (*Id*. at 43–44.) The rule will thus require manufacturers to deliver up to 100% more ZEVs than they would absent the rule.

Not only would the MCCR violate federal law because it is preempted, but in an unprecedented step, MPCA proposes to enforce emissions rules even before the effective date of the MCCR through an early action credit program. MPCA describes the early action credit program as an "enforcement mechanism," and it will be effective five working days after the rulemaking process is complete. (Compl. Ex. A at 53.) It establishes a "voluntary" mechanism by which manufacturers can begin to accrue "credit" towards the ZEV quotas by delivering ZEVs for sale in Minnesota even before the MCCR becomes effective. (Compl. Ex. A at 53; Compl. Ex. C (Proposed Rule 7023.0300, subp. 4).)

**Background on the Economics of New Car Sales**

The manufacturers will deliver these vehicles not to Minnesota *consumers* but to auto *dealers*. Minnesota franchise law prohibits manufacturers from selling vehicles directly to consumers if the manufacturer has an established franchise dealer network. Minn. Stat. § 80E.13(i). At present, all the legacy manufacturers have such franchises in Minnesota. The only way manufacturers can meet the obligations of the MCCR by "delivering [ZEVs] for sale" is to deliver them to dealers.

Importantly, when a manufacturer "delivers" a vehicle to a dealer, the dealer must purchase it from the manufacturer. (Affidavit of Scott Lambert ("Lambert Aff.") ¶¶ 5–6.)

4

Dealers rarely use capital to purchase inventory. (Affidavit of Timothy Ciccarelli ("Ciccarelli Aff.") ¶ 17; Affidavit of Douglas Erickson ("Erickson Aff.") ¶ 20; Affidavit of Chester Lockwood ("Lockwood Aff.") ¶ 13; Affidavit of Steve Whitaker ("Whitaker Aff.") ¶ 13.) Instead, they finance the purchases through "floor planning," a short-term, loan, typically between 30 and 120 days, arranged through the manufacturer, a subsidiary of the manufacturer, or a bank. (Lambert Aff. ¶¶ 7–9.) The loan accrues interest as the vehicle sits on a dealer's lot. (Ciccarelli Aff. ¶ 18; Lockwood Aff. ¶¶ 14–15; Whitaker Aff. ¶¶ 13, 15.) Manufacturers often provide dealers with a "floor plan credit," which offsets the interest on the loan. (Ciccarrelli Aff. ¶ 19; Erickson Aff. ¶¶ 21–22.) Usually, the floor plan credit is enough to pay the interest for 30–60 days. (Ciccarreli Aff. ¶ 19; Erickson Aff. ¶ 23.) After the floor plan credit is used up, the dealership has to begin paying the interest itself. (Erickson Aff. ¶ 24.)

Naturally, once the dealers have purchased the required vehicles from the manufacturers, the dealer will attempt to sell them. Dealers have already embraced efforts by manufacturers to sell hybrids and ZEVs. (Erickson Aff. ¶ 50; Lockwood Aff. ¶¶ 40–44.) They have invested in infrastructure and tools necessary to sell and service ZEVs. (Erickson Aff. ¶ 50; Lockwood Aff. ¶¶ 40–43.) MPCA acknowledges that only about 1% of new vehicles on the lot are ZEVs, (Compl. Ex. A at 49.), but that is not due to lack of interest by dealers in selling ZEVs, (Ciccarelli Aff. ¶¶ 32–34; Erickson Aff. ¶¶ 42, 50; Lockwood Aff. ¶¶ 35–36, 40–44; Affidavit of Michael Stanzak ("Stanzak Aff.") ¶ 13; Whitaker Aff. ¶ 38.) The Chevy Bolt is a presently available ZEV sold by multiple MADA members; MADA members are committed to selling the Ford Mach E Mustang, the GMC

5

Humvee, and the Cadillac Lyriq when they arrive. (Ciccarelli Aff. ¶ 38; Erickson Aff. ¶ 51; Affidavit of Gregory House ("House Aff.") ¶¶ 41–50; Lockwood Aff. ¶¶ 40–44; Stanzak Aff. ¶¶ 10–13; Whitaker Aff. ¶ 43.)

Rather, the low number of EVs at dealerships is the result of low consumer demand; ZEVs have often languished on dealers' lots. (Ciccarelli Aff. ¶ 37; Erickson Aff. ¶¶ 47–48; Lockwood Aff. ¶¶ 40–44.) As evident from sales figures, EV models simply do not match what Minnesota customers want. Approximately 90% of new car sales in Minnesota are trucks and SUVs, (Ciccarelli Aff. ¶ 32; Erickson Aff. ¶ 41; Lockwood Aff. ¶ 35; Whitaker Aff. ¶ 37.); Minnesotans, these sales figures reveal, want long-range cars that can haul and tow. The upcoming electric Humvee may meet some of these needs, but it costs at least $100,000, well beyond the means of average buyers. (Whitaker Aff. ¶ 46.) Under the MCCR, consumers remain free to buy the vehicle they want. If the requisite consumer demand for ZEVs currently existed, the MCCR would be unnecessary because dealers stock based on customer demand. (*See* Ciccarelli Aff. ¶¶ 32–34; Erickson Aff. ¶ 42; Lockwood Aff. ¶¶ 35–36; Stanzak Aff. ¶ 13; Whitaker Aff. ¶ 38.)

The MCCR's requirement that dealers purchase seven to ten times more ZEVs than at present will harm dealers. *See infra*, p. 10. Because the supply will far exceed existing demand, vehicles will remain on the lot for longer periods. Vehicles that sell slowly reduce the dealership's potential to make a profit on that particular vehicle. (Ciccarrelli Aff. ¶ 19; Erickson Aff. ¶¶ 24, 46; Whitaker Aff. ¶ 15.) If the vehicle continues to remain on the lot, the dealership risks "curtailment," which is having to use its limited capital to pay both the interest and the principal on the floor planning loan. (Ciccarelli Aff. ¶ 20; Lockwood Aff.

6

¶ 15; Whitaker Aff. ¶ 16.) Curtailment not only reduces potential profit, even more significantly, it can put a dealership at risk of going out of business because it ties up large portions of a dealership's capital. (Ciccarelli Aff. ¶ 20; Lockwood Aff. ¶ 15; Whitaker Aff. ¶ 16.) Because of the floor plan lending system, inventory that does not sell quickly can add substantially to the financial burden and risk for a dealership.

Not only do slow-selling models generate additional interest and carrying costs, and tie up dealer capital, they limit a dealership's ability to stock the vehicles that do sell profitably. Dealerships have limited lot space to stock the kinds of models that their customers purchase. (Lockwood Aff. ¶ 38.) For the past ten to fifteen years, approximately 80–90% of new car sales in Minnesota have been non-ZEV trucks and SUVs. (Erickson Aff. ¶ 41; Lockwood Aff. ¶ 35; Whitaker Aff. ¶ 37.) For some dealerships, in the last year, 100% of the new car sales have been trucks and SUVs. (Ciccarelli Aff. ¶ 32; Whitaker Aff. ¶ 8.) Dealers rely on the consistent and profitable sales of these models in order to compensate for slower moving, less popular merchandise. (Ciccarelli Aff. ¶ 33–34; Lockwood Aff. ¶ 37; Whitaker Aff. ¶ 39.) The forced purchase of ZEVs will reduce the number of in-demand vehicles dealers can stock and put at risk the financial sustainability of the business. (*See* Lockwood Aff. ¶ 38; Whitaker Aff. ¶ 40.)

A separate portion of the proposed rule, the LEV standard, exacerbates this effect. A dealer's lot stock is only a portion of its sales. Dealers depend on trades with other dealers to obtain the precise vehicle their customers want if those vehicles are not on the lot. (Ciccarelli Aff. ¶ 25; Lockwood ¶ 25; Stanzak Aff. ¶ 14–17.) Many of these trades cross state lines. (Erickson Aff. ¶ 34; Lockwood Aff. ¶ 29; Stanzak Aff. ¶ 19.) At the same time

7

their lot space and capital is constrained by the ZEV requirement, they will lose the ability to trade with neighboring states whose cars will not meet the LEV standard. (Erickson Aff. ¶ 35; Stanzak Aff. ¶¶ 20.) While they can trade with other, faraway, California-compliant states, the costs will be considerably higher, and, for some, cost prohibitive. (Erickson Aff. ¶¶ 36–40; House Aff. ¶¶ 16–21; Lockwood Aff. ¶¶ 30–34; Stanzak Aff. ¶¶ 21–26; Whitaker Aff. ¶¶ 30–36.)

The LEV standard also cuts off access to a section of the dealers' customer base. Many of the dealers have customers from surrounding states. (Ciccarelli Aff. ¶ 21; Erickson Aff. ¶¶ 25–26; Lockwood Aff. ¶¶ 16–17; Whitaker Aff. ¶¶ 17–18.) Under the LEV standard, Minnesota vehicles will be more expensive than the same model sold in these surrounding states. (Compl. Ex. A at 68–70 (explaining that LEVs "cost more to manufacture than non-LEV ICE vehicles," which would lead to "higher purchase prices for LEV-certified vehicles").) As a result, dealers will lose customers. (Ciccarelli Aff. ¶ 22; Lockwood Aff. ¶¶ 18–23; Stanzak Aff. ¶¶ 27–32; Whitaker Aff. ¶¶ 19–23.)

## STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Bank One, Utah v. Guttau,* 190 F.3d 844, 847 (8th Cir. 1999). As the movant, MADA has the burden of establishing each of the elements. *Lankford,* 451 F.3d at 503.

## ARGUMENT

MADA is likely to succeed on the merits as both the CAA and EPCA preempt MPCA's attempt to adopt the MCCR. MADA's members will suffer irreparable harm if MPCA is allowed to continue its regulatory efforts because the MCCR creates an immediate obligation for manufacturers to push unsellable inventory on the dealers, resulting in lost profits, financing costs, and lost sales. Granting the injunction prevents more harm to MADA's members than it would harm the state because there is no harm to a state in delaying regulatory efforts that are illegal. Finally, the injunction is in the public interest because it stops the state's illegal rule but still leaves the state time to adopt California's standards on its desired timeline, provided it gains the authority.

### I.     MADA Is Likely To Succeed On The Merits.

MADA has standing to bring this action and is likely to succeed on the merits because both the CAA and EPCA have express preemption provisions that preempt the MCCR's new-vehicle GHG emission standards and the ZEV mandate.

### A.     MADA Has Standing.

To have Article III standing, a federal plaintiff must assert injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As an association, MADA has standing on behalf of its members if the "members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action," the interests the association "seeks to protect are germane to the organization's purpose," and "the nature of the claim and of the relief sought" means the individual members' participation is not

required. *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552–53 (1996). MADA meets each of these requirements.

First, the rule will cause a concrete and particularized injury to MADA. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, and not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. (internal quotations and citations omitted). "Risk of direct financial harm establishes injury in fact." *Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969, 975 (8th Cir. 2014). As outlined above and in MADA's complaint, the rule unambiguously commands manufacturers to deliver more ZEVs to dealers in Minnesota. These ZEVs will monopolize lot space, require expensive tools and infrastructure, add to dealers' floor plan interest costs, and tie up capital that could be used for profitable vehicles. (*see supra* pp. 4–7; Compl. ¶¶ 46–47, 51–54.) MPCA's adoption of California's LEV GHG standard will cause dealers to lose sales either because they could not complete a trade to get the exact model the customer wanted or because the customer will buy a cheaper federal car in another state. (*see supra* pp. 7–8; Compl. ¶¶ 58–63.) These harms are particularized to Minnesota dealers.

To establish causation, a federal plaintiff must demonstrate that the injury is fairly traceable to the challenged activities of the defendant. *Lujan*, 504 U.S. at 560. MPCA acknowledges the injuries are traceable to the rule. MPCA estimates that currently 1% of new cars on the lot are ZEVs but "under the [MCCR] compliance scenario, approximately 6.0 - 7.5% of total light duty vehicle sales [to dealers] will need to be [Z]EVs." (Compl. Ex. A at 49–50.). By the agency's own estimate, the proposed rule will be the cause of this

rise. Likewise, the MCCR completely disrupts dealers' trading or selling in neighboring states that have not adopted the California LEV III GHG standards. (*See supra* pp. 7–8; Compl. ¶¶ 58–63.)

To establish redressability, the federal plaintiff must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'" by the court. *Lujan*, 504 U.S. at 561. The injuries to MADA's members in this case would be redressed by an injunction from this court. The injuries to the dealers arising from the ZEV delivery mandate, (*see supra* pp. 4–7; Compl. ¶¶ 46–57), simply will not occur if this Court issued an injunction enjoining MPCA from finalizing the rules because, in MPCA's own reckoning, manufacturers will not deliver the increased volume of unsought, slow-selling ZEVs to Minnesota dealers absent the proposed rule. Additionally, if the MCCR is enjoined dealers will continue their normal practice of trading and selling vehicles across state lines. (*See supra* pp. 7–8; Compl. ¶¶ 58–63.)

A trade association such as MADA must also show that the "interests [it] seeks to protect are germane to the organization's purpose," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977), and that relief does not require participation of its members, *United Food & Commercial Workers*, 517 U.S. at 553. With this action, MADA is seeking to protect interests of Minnesota dealers against the harms that will result from the MCCR; these interests are germane to MADA's organizational purpose as a trade association. (*See* Compl. ¶ 11.) An injunction ordering MPCA to stop its illegal rulemaking does not require the participation MADA's member.

**B.     The Claim Is Ripe.**

In addition to constitutional standing requirements, federal courts consider whether the claim is ripe for judicial review. "[R]ipeness is demonstrated by a showing that a live controversy exists such that the plaintiffs will sustain immediate injury from the operation of the challenged provisions." *S. Dakota Min. Ass'n, Inc. v. Lawrence Cty.*, 155 F.3d 1005, 1008 (8th Cir. 1998); *Pub. Water Supply Dist. No. 10 v. City of Peculiar, Mo.*, 345 F.3d 570, 572–73 (8th Cir. 2003). The issue of MPCA's authority to adopt these rules is a live controversy and fit for review because MADA "challenges not the state's ultimate substantive decision but its authority to even conduct the contemplated proceeding." *Middle S. Energy, Inc.*, 772 F.2d at 410 (affirming injunction preventing a state agency from starting its proceedings because its actions were preempted by the Federal Power Act). MPCA has already committed to going forward with an illegal regulatory effort; there is no need for this Court to await the inevitable outcome of that effort to determine the threshold question of whether the agency has the requisite statutory authority.

There will be hardship to MADA if the Court declines to decide the dispute. MADA's members' injuries are "certainly impending," *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), because the early action credit program will "go into effect five working days after MPCA publishes a Notice of Adoption in the *State Register* following completion of the rulemaking process." (Compl. Ex. A at 53.) The timing of the early action credit means that MADA's members will imminently have to start taking new ZEVs and will have to continue to do so while the uncertainty of the federal

litigation and regulation—upon which MPCA's authority to enforce the rule turns—plays out. For these reasons, this matter is ripe for the Court's adjudication.

### C.    The MCCR Is Preempted Under the CAA and EPCA.

MADA is likely to succeed on the merits of its preemption claim because the CAA and EPCA expressly preempt state new-vehicle GHG emission standards and ZEV mandates, including those in the MCCR. Under the U.S. Constitution, federal law "shall be the supreme Law of the Land." U.S. Const. at VI, cl. 2; *see also In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*, 621 F.3d 781, 791 (8th Cir. 2010). "[T]he Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail." *Gonzales v. Raich*, 545 U.S. 1, 29 (2005). State law is invalid under the Supremacy Clause when it is expressly preempted. Express preemption occurs when the federal statute includes plain language preempting state law. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). In determining whether there is preemption, courts look for whether preemption "was the clear and manifest purpose of Congress," which "may be indicated through a statute's express language or through its structure and purpose." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *see also St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021–22 (8th Cir. 2015).

The CAA has an express preemption clause. "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle." 42 U.S.C. § 7543(a). The only exception to the statute is when the Administrator of the EPA waives the application of the CAA preemption clause to California new-vehicle emission standards that meet certain criteria.

13

42 U.S.C. § 7543(b)(1). Once California has adopted a set of vehicle emission standards pursuant to a valid EPA waiver, the CAA then allows any other state meeting certain preconditions to adopt the vehicle emission standards as their own without running afoul of the CAA preemption clause. so long as the state's standards are "identical to the California standards for which a waiver has been granted." 42 U.S.C. § 7507. EPA has revoked the waiver that formerly provided authorization for California's new-vehicle GHG emission standards and ZEV mandate, which are the California standards that MPCA proposes to adopt. 84 Fed. Reg. 51,310 (Sept. 27, 2019). Without the waiver in place, the plain language of the CAA preempts any state regulation of new-vehicle GHG emission standards or a ZEV mandate. Accordingly, the CAA prohibits all states, including Minnesota, from attempting to regulate new-vehicle GHG emissions or impose ZEV mandates.

The EPCA also preempts Minnesota's authority to enact the MCCR. The EPCA prevents states from deviating from national standards relating to fuel economy. In a section entitled "Preemption," the EPCA states, "a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard." 49 U.S.C. § 32919. NHTSA regulations specify that any state law or rule that has "the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919." 49 C.F.R. pt. 531, App. B(a)(3). *See also* 49 C.F.R. pt. 533, App. B(a)(3) (same, for light trucks); 84 Fed.

14

Reg. 51,310, 51,313 (Sept. 27, 2019) (NHTSA's preamble to these rules, clarifying that there is a "physical and mathematically measurable relationship between carbon dioxide emissions and fuel economy"). Because the MCCR's greenhouse gas standards and ZEV mandate regulate and/or prohibit automobile tailpipe carbon dioxide emissions, they fall squarely within the scope of the EPCA's preemption clause and NHTSA's regulation. *See id.* at 51,313–14 (NHTSA's determination that California's GHG standards and ZEV mandate, both of which the MCCR incorporates by reference, are preempted by the EPCA). The MCCR is thus expressly preempted under both the EPCA and CAA.

The Eighth Circuit has also granted motions for preliminary injunctions based on preemptive language similar to that in the CAA and EPCA. *See, e.g.*, *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465, 468–70 (8th Cir. 1987) (affirming an injunction because the Natural Gas Pipeline Safety Act's provision states, "[n]o State agency may adopt or continue in force *any* such standards applicable to *interstate* transmission facilities" preempted Iowa's law).

The Eighth Circuit has granted motions for preliminary injunctions based preemptive language far less strict than that in the CAA and EPCA. In *St. Louis Effort for AIDS v. Huff*, for example, the plaintiff sought to enjoin Missouri's Health Insurance Marketplace Innovation Act as preempted by the Affordable Care Act ("ACA"). 782 F.3d 1016, 1019 (8th Cir. 2015). The ACA states, "Nothing in this title shall be construed to preempt any State law that does not prevent the application of the provisions of this title," 42 U.S.C. § 18041(d), which courts have interpreted to mean the ACA preempts only state laws that "hinder or impede" implementation of the ACA. *See St. Louis Effort*, 782

15

F.3d at 1022. Unlike the CAA and EPCA, this language does not preempt all state laws, just those that "hinder or impede" the ACA; yet the Eighth Circuit still determined that three of the state laws at issue were preempted by the ACA, and the court enjoined the three provisions. *Id.* at 1025–27; *see also Bank One*, 190 F.3d at 848–50 (enjoining Iowa from enforcing a state law regulating automatic teller machines because it conflicted with the National Banking Act's grant of "the authority to exercise 'all such incidental powers as shall be necessary to carry on the business of banking'").

The CAA and EPCA do not include language like that in the ACA meant to circumscribe the preemptive effect of the statute. Their express preemption provisions are unequivocal and broad. No state is permitted to regulate emissions outside of the limited California-waiver process. And no state is permitted to issue regulations that relate to fuel economy, which includes new-vehicle GHG emission standards and ZEV mandates. Any state law or regulation that attempts to do either is preempted by the CAA and EPCA.

MPCA attempts to make an end run around federal preemption by saying it is merely adopting the rules but not enforcing them. (*See* Compl. Ex. A at 52–53, 53 n.83.) This position is untenable. Minnesota and MPCA are doing more than just adopting California's regulations and waiting until the waiver is granted before enforcing. Through the early action credit, which MPCA itself describes as an "enforcement mechanism," MPCA will be requiring compliance with the new rules before EPA reinstates California's waiver or NHTSA changes its preemption rule, if they ever do. (*See supra* pp. 4–7); *compare Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. State Dep't of Envtl. Conservation*, 17 F.3d 521, 534 (2d Cir. 1994) (holding that New York could adopt certain California emission

16

standards while awaiting EPA's grant of the waiver for California, "so long as [the state agency] makes no attempt to enforce the plan prior to the time when the waiver is actually obtained").

## II.    MADA Will Suffer Irreparable Harm Without Injunctive Relief.

Regarding the second element of the injunction standard set forth in *Winter v. Natural Resources Defense Council, Inc.*, MADA will be substantially and irreparably harmed if this Court does not immediately enjoin Minnesota and MPCA from proceeding with their illegal regulatory efforts. 555 U.S. at 22. MADA can "demonstrate that irreparable injury is *likely* in the absence of an injunction" due to unquantifiable loss of customer goodwill and, additionally, unrecoverable financial losses associated with the early action credit program. *Id.* In particular, they will incur unrecoverable financial losses from having their lots monopolized by slow-selling ZEVs as a result of the early action credit program. The early action credit will be the first piece of the MCCR that goes into effect as it will be effective five days after the completion of the rulemaking. (Compl. Ex. A at 53.) The timing of the early action credit means that without an injunction stopping MPCA's illegal rule, MADA's members will imminently be harmed.

As explained above and in MADA's complaint, MADA's members will have to purchase these ZEVs from their manufacturers, and they will take both space and capital that would otherwise go towards stocking popular models that customers buy, resulting in lost sales, missed profits, and tarnished goodwill. (*see supra* pp. 4–7; Compl. ¶¶ 45–57.) Courts have recognized that there is an irreparable injury associated with losing access to a product that customers value and draw customers to a business. For example, in *Ross-*

*Simons of Warkwick Inc. v. Baccarat, Inc.*, Ross-Simon had a wedding business, including a wedding registry, and a contract as an authorized dealer with Baccarat, a crystal company. 102 F.3d 12, 14–15 (1st Cir. 1996). Baccarat stopped filling Ross-Simon's orders and told Ross-Simon to stop including Baccarat crystal in its advertisements. *Id.* The court recognized the harm from losing access to this specific product because being able to provide a specific product attracts customers. *Id.* at 19–20. In particular, the court explained,

> Although not among Ross–Simons' best-selling lines, Baccarat crystal is a prestigious item—a unique, top-shelf line that boasts considerable allure and that is capable of serving as a beacon to attract potential customers. In the context of a bridal registry, as in a variety of other commercial settings, the availability of a product line is as important, if not more important, than the amount of sales generated.

*Id.*

Other courts have similarly determined that there is irreparable harm from losing customer goodwill or being at a competitive disadvantage associated with losing access to a specific product. *See, e.g., Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908–09 (2d Cir.1990) (finding irreparable harm when foreign photojournalism organization threatened to stop providing plaintiff with images); *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444–45 (2d Cir. 1977) (finding irreparable injury where plaintiff-contractor lost access to defendant-manufacturer's product and demonstrated competitive disadvantage and loss of customer goodwill); *Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725, 728 (3d Cir. 1962) (finding irreparable injury when plaintiff, wholesaler pharmaceutical company, risked loss of a particular product).

Popular vehicle models are "capable of serving as a beacon to attract potential customers" in the same way that Baccarat crystal attracted couples getting married, photographs from a specific foreign photojournalist organization attracted readers, and a specific type of medicine available at a wholesaler attracted its retail customers. The risk is not just that MADA members will lose sales of popular models but that they will lose customers, and whatever purchase those customers would have ultimately made, because they have lost access to the products that draw customers into their businesses. The loss of those potential customers and sales is an irreparable injury.

In addition to the lost sales, there are the stranded costs associated with the cost of carrying slow-selling vehicles and from going through the rulemaking process. As explained above, the longer a vehicle remains on the lot, the more it costs the dealership. (*see supra* pp. 4–7; Compl. ¶¶ 51–53.) And with more and more slow-selling vehicles those costs will increase while leaving less space and capital for the models that allow dealers to make a profit and stay in business. MADA's members will not be able to recover those losses or the costs of participating in the rulemaking when the new rules are determined to be invalid as preempted. *Cf. Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *see also Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102–03 (1984); *Pub. Utils. Comm'n v. United Fuel Gas Co.*, 317 U.S. 456, 469 (1943) (outlining the harm from the expense of complying with preempted state enforcement proceeding); *Baker Elec. Co-op., Inc. v. Chaske,* 28 F.3d 1466, 1472–73 (8th Cir. 1994); *Middle S. Energy*, 772 F.2d at 418 (explaining the irreparable harm was in the form of interference with right to be free of preempted state action).

19

**III.     The Balance Of Equities Favors Granting The Injunction.**

The balance of the equities supports granting the injunction. Courts recognize that there is no harm to the state in preventing it from moving forward with implementing an illegal regulatory scheme, *Rodgers v. Bryant*, 301 F. Supp. 3d 928, 937 (E.D. Ark. 2017), *aff'd*, 942 F.3d 451 (8th Cir. 2019), and "any delay will avoid the needless expenditure of public funds" while this Court considers the validity of the rules, *Idaho Bldg. & Const. Trades Council, AFL-CIO v. Wasden*, 834 F. Supp. 2d 1091, 1102 (D. Idaho 2011). The balance of hardship tips decidedly towards MADA. The state need only wait and see (and not waste resources), while MADA members bear irreparable financial harms.

The delay is especially important to prevent the state from wasting resources given the degree of uncertainty on the federal level. As MPCA has already acknowledged, if California's waiver is not reinstated it "would probably have to revoke the whole rule." (Compl. Ex. F; *see also* Compl. Ex. A at 36–37, 52–53.) Even if California requests EPA reinstate the waiver and EPA agrees, EPA will have to go through notice and comment rulemaking and whatever litigation is prompted by its actions. *Cf.* 78 Fed. Reg. 2112 (Jan. 9, 2013) (EPA notice and comment rulemaking to reinstate waiver in 2013). MPCA will also have to see whether NHTSA changes its new rule that new-vehicle GHG emission standards and ZEV mandates are preempted by the EPCA. There is also pending federal litigation relating to both EPA and NHTSA's rules that could dictate how the agencies and their new administrators respond. *See, e.g., California v. Wheeler*, No. 19-1230 (D.C. Cir. filed Nov. 15, 2019); *California v. Wheeler*, No. 19-1239 (D.C. Cir. filed Nov. 15, 2019). If Minnesota is allowed to move forward with its illegal rules while the dispute between

California and EPA and NHTSA proceeds the result will be more legal confusion for manufacturers' and dealers' about their obligations and more harm to MADA's members as the early action credit program will effectively mandate compliance with the rules well before the parties know if Minnesota has the authority to impose the standards.

Moreover, the changing federal regulatory landscape will influence the rationale for adopting the rules, meaning that a delay in the rulemaking will ensure MPCA does not needlessly tie itself to California. MPCA relies heavily on the federal "regulatory backslid[e]" to support the reasonableness of adopting California's standards, stating, "the federal government recently acted to reduce the environmental protectiveness of [vehicle air pollution] standards. It is reasonable for MPCA to adopt the California standards to prevent this regulatory backsliding."  (Compl. Ex. A at 37; *see also* Starns Decl. Ex. A at 11 ("One of the purposes of the proposed Clean Cars Minnesota rule is to maintain the GHG emissions standard in Minnesota in light of this federal [deregulation]."), 23–25 (outlining the recent federal "regulatory backslid[e]"). In a matter of days, however, there will be a new President of the United States and new administrators of EPA and NHTSA. And President-elect Biden has indicated support for stricter emission requirements. (Starns Decl. Ex. B, Maxine Joselow, *Early Test for Biden: Car Emissions Rules*, E&E News (Nov. 30, 2020).).  Given MPCA's reliance on actions at the federal level that are now changing, there will be little harm to the state in waiting to see the new federal landscape.

Finally, halting MPCA's rulemaking efforts now, in this moment of legal uncertainty between the on-going federal litigation and a new presidential administration, will not harm the state's efforts to protect the public from GHG emissions. From the state's

21

announcement about the rule, its goal is to have the regulation apply to model year 2025, which starts with cars sold in 2024. (*See* Starns Decl. Ex. C, Clean Car MN/MPCA Fact Sheet *Clean Cars Minnesota rule* (Dec. 18, 2020).). Because the CAA requires states to wait two years between when they adopt regulations and the model year to be regulated, the state has all of 2021 to enact these rules and still be able to regulate vehicles in model year 2025. *See* 42 U.SC. § 7507(2). As a result, there will be no harm to the state's timeline and regulatory goals by pausing its actions now so that it may take stock of the significant changes happening around it.

## IV.   Public Interest Favors Granting The Injunction.

Finally, public interest also favors entry of an injunction.

> If [the plaintiff] proves that the relevant provisions of the [state laws] are preempted by [a federal statute] and that it will suffer irreparable harm if the State is not enjoined from enforcing those provisions, then the question of harm to the State and the matter of the public interest drop from the case, for [the plaintiff] will be entitled to injunctive relief no matter what the harm to the State, and the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law.

*Bank One*, 190 F.3d at 847–48; *see also Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds*, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("'[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law.") (alterations in original). Under Eighth Circuit precedent, public interest (and balance of the equities) carries considerably less weight in the analysis where, as here, the plaintiff seeks to enjoin the state from moving forward with state laws or regulations that are preempted by federal law.

22

As explained above, there will be no harm to the public interest in slowing down MPCA's rulemaking timeline. The deadline for regulating model year 2025 vehicles is January 1, 2022. *See* 42 U.S.C. § 7507(2). MPCA will have all of 2021 to enact these regulations and will have better information about the federal standards if it waits.

## CONCLUSION

For all the reasons stated above, MADA respectfully requests that this Court issue a preliminary injunction prohibiting MPCA from conducting rulemaking proceedings on the proposed Minnesota Clean Car Rules and adopting an Early Action Credit rule before it has authority to "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles" under the CAA and the EPCA.

Dated: January 8, 2021

/s/ *Byron E. Starns*
Byron E. Starns, #104486
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1516
Mobile: (612) 308-2149
byron.starns@stinson.com

Jeremy Greenhouse, #328443
THE ENVIRONMENTAL LAW
GROUP, LTD
2263 Waters Drive
Mendota Heights, MN 55120
Telephone: (612) 623-2391
jgreenhouse@envirolawgroup.com

**ATTORNEYS FOR PLAINTIFF**

2054106.0018/163084410