UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Auto Dealers Association,<br><br>    Plaintiff,<br><br>  v.<br><br>State of Minnesota, by and through the Minnesota Pollution Control Agency and the Minnesota Pollution Control Agency Commissioner Laura Bishop,<br><br>    Defendants. | Case No. 21-cv-53-WMW-ECW<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AND IN REPONSE TO MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................ 1

II.   BACKGROUND ................................................................................ 2

      A.    VEHICLE EMISSIONS AND THE CLEAN AIR ACT ............................. 3

      B.    FUEL EFFICIENCY AND THE ENERGY POLICY & CONSERVATION ACT .......... 5

      C.    HISTORIC IMPLEMENTATION OF EMISSIONS REGULATIONS ......................... 6

      D.    THE TRUMP ADMINISTRATION'S ATTEMPTS TO ROLL BACK
            EMISSIONS AND FUEL ECONOMY STANDARDS ............................... 7

      E.    MPCA'S PROPOSED (BUT NOT YET ADOPTED) RULE .................................. 9

            1.    Minnesota's proposed rule seeks to address climate change
                  and facilitate consumer choice. ............................................ 9

            2.    The proposed rule is contingent on a valid waiver. ........................ 11

            3.    Several steps remain, including public comment, which could
                  change the proposed rule................................................... 13

III.  ARGUMENT ................................................................................ 14

      A.    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED ....................................... 15

            1.    Plaintiff fails to state a claim because the proposed rule will
                  not contravene federal law. ............................................... 16

            2.    Plaintiff's claims are not ripe. ........................................... 17

            3.    Plaintiff and its members lack standing. ......................................... 23

            4.    Plaintiff's suit is barred by the Eleventh Amendment. .................... 26

      B.    PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE
            DENIED. .................................................................................. 28

            1.    Plaintiff does not meet its burden of demonstrating any
                  likelihood of success on the merits. ................................. 29

2.      Plaintiff will not be irreparably harmed. ........................................... 30

3.      The balance of harms favors denying the injunction. ...................... 36

4.      The public interest favors allowing the administrative hearing
        to proceed. ...................................................................................... 37

IV.   CONCLUSION ...................................................................................... 37

## I.   INTRODUCTION

Plaintiff Minnesota Auto Dealers Association brought this action seeking unprecedented relief—a federal court declaration invalidating a *proposed* Minnesota Pollution Control Agency (MPCA) rule *that is still under review, is not final, and remains subject to revision*. Even more extraordinarily, Plaintiff seeks a preliminary injunction not merely to prevent the rule from ultimately going into effect, but also to enjoin MPCA from even conducting any procedural administrative rulemaking hearings to advance the rule.

The Court should dismiss Plaintiff's complaint as premature and non-justiciable. Federal courts consistently hold that claims seeking to invalidate proposed administrative rules are not ripe. The courts have done so in stark and certain terms: "In justiciable cases, this Court has authority to review the legality of final agency rules. We do not have authority to review proposed agency rules." *Murray Energy Corp. v. Envtl. Protection Agency*, 788 F.3d 330, 333–34 (D.C. Cir. 2015) (rejecting challenge brought to rule concerning power plant emissions as unripe because rule was not yet final). Simply put, Plaintiff has an avenue to assert its concerns with the proposed rule—by making comments and participating in the public comment process. It must engage with that process before resorting to litigation. Plaintiff's claims should be additionally dismissed because Plaintiff lacks standing to bring the claims, and because all Defendants have Eleventh Amendment Immunity to suit in federal court.

The Court should also dismiss Plaintiff's complaint because it fails to state a cause of action. There is no risk of a conflict between the proposed rule and federal law because the proposed rule explicitly conditions its effectiveness of the reinstatement of a federal

waiver. There is no legally cognizable cause of action that can prevent the State from preparing for reinstatement of the waiver.

If the Court even reaches the issue of Plaintiff's motion for a preliminary injunction, it should be denied. Courts grant preliminary injunctions only where a party has a strong likelihood of success on the merits of its claim and will suffer an irreparable harm *before* that claim can be adjudicated. Here, even if Plaintiff's claims had merit (and they do not) the proposed rule cannot be adopted without several more months of administrative rulemaking proceedings. And even if MPCA adopts the rule unchanged, the rule expressly states that it will not become effective unless the federal waiver that underpins it is reinstated. And even if MPCA adopts the rule unchanged, and the federal waiver is reinstated, the proposed rule (still presently under review and subject to change) provides an *additional* grace period of two years before its requirements become effective. As a result, there is no imminent risk of any harm to Plaintiff, let alone an irreparable harm to Plaintiff if MPCA holds an administrative hearing as part of its rulemaking process. Plaintiff's motion for a preliminary injunction should therefore be denied.

## II.    BACKGROUND

Before reaching the merits of MPCA's motion to dismiss or Plaintiff's requested preliminary injunction, Defendants provide some background on how cooperative federalism has been implemented to address vehicle emissions, how the proposed Minnesota Clean Cars Rule ("proposed rule")—if adopted—would fit in this national system pursuant to congressionally-preserved state authority, and how the upcoming

hearings Plaintiff seeks to enjoin will not immediately result in any final rule, much less one that will be soon effective.

### A.     Vehicle Emissions and the Clean Air Act

The Clean Air Act (CAA) was originally passed in 1955 and significantly updated over the years to address pollution that had "resulted in mounting dangers to the public health and welfare." 42 U.S.C. §§ 7401 *et seq*. It is a large, complex law that covers a variety of pollution types and sources including power generation (stationary sources) and the transportation sector (mobile sources). Environmental Protection Agency (EPA), *History of Reducing Air Pollution from Transportation in the United States*, https://www.epa.gov/transportation-air-pollution-and-climate-change/accomplishments-and-success-air-pollution-transportation. Section 202 of the CAA directs the EPA to prescribe regulations to control (and from time to time revise) emissions from new motor vehicles. 42 U.S.C. § 7521(a). A long history of amendments demonstrates the nation's struggle to deal with air pollution and vehicle emissions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dep't of Envtl. Conservation*, 17 F.3d 521, 524–29 (2d Cir. 1994) ("*MVMA*") (collecting legislative history of CAA and its amendments including significant changes in 1967, 1970, 1977, and 1990).

The CAA was passed at a time when individual states—especially California—were developing their own approaches to motor vehicle emissions. *Id.* at 524–25. In the interest of developing a national standard for vehicles and avoiding piecemeal solutions, the CAA's 1967 amendments preempted individual state regulations—*except* for California, which was permitted to apply for and receive a waiver for its own standards as long as they are at

least as protective as the federal standards. *Id*.; CAA § 209(b), 42 U.S.C. § 7543(b). The CAA mandates that California's waiver application "shall" be granted so long as certain conditions apply: (A) California's protectiveness determination cannot be arbitrary or capricious, (B) California still needs its own regulatory program because of "compelling and extraordinary conditions," and (C) California's "standards and accompanying enforcement procedures" must be consistent with Section 202(a). *Id*.

Since 1968, California has received numerous waivers, including for its low-emissions vehicle (LEV) and zero-emissions vehicle (ZEV) standards, most recently in 2013 for the 2017 and later model years.[1] Indeed, EPA has granted California almost every waiver the state has ever sought, including those for both LEV and ZEV programs.[2] *See Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 463 (D.C. Cir. 1998).

A set of amendments in 1977 allowed additional states to adopt standards consistent with California's standards. *Id*.; *see also* CAA § 177, 42 U.S.C. § 7507. Congress provided that any state with a qualifying State Implementation Plan for achieving national standards approved by EPA could adopt standards identical to California's standards without any additional application to, or approval from, EPA. *Id*. To date, fourteen states have used this federally conferred authorization to adopt some or all of California's standards. These states are known collectively as "Section 177 States." California Air Resources Board,

---

[1] *E.g.*, 58 Fed. Reg. 4166 (Jan. 13, 1993); 71 Fed. Reg. 78,190 (Dec. 28, 2006); 78 Fed. Reg. 2112 (Jan. 9, 2013).

[2] EPA has only *once* denied California a waiver in full, reversing shortly thereafter. 74 Fed. Reg. 32,744, 32,745 (July 8, 2009). It revoked a duly-granted waiver for the first time ever in 2019, as discussed *infra* Part II.D.

*States that have Adopted California's Vehicle Standards under Section 177 of the Federal Clean Air Act*, https://ww2.arb.ca.gov/sites/default/files/2019-10/ca_177_states.pdf. Currently, Minnesota, Nevada, and New Mexico are all considering becoming Section 177 states.[3]

### B.      Fuel Efficiency and the Energy Policy & Conservation Act

Separate from the air pollution crisis of the 1960s and 1970s, the nation also faced an energy crisis in the mid-1970s. Congress enacted the Energy Policy & Conservation Act (EPCA) as "an omnibus measure that include[d] a myriad of provisions pertaining to the production, stockpiling, conservation, and pricing of energy resources." *Common Cause v. Dep't of Energy*, 704 F.2d 245, 246 (D.C. Cir. 1983). EPCA includes a fuel-economy chapter to be administered by the National Highway Transportation Safety Administration (NHTSA).

Various emissions-reducing technologies can affect fuel economy—in either direction. So EPCA requires NHTSA to prescribe the corporate average fuel economy to the maximum feasible level that manufacturers can achieve for a given model year. 49 U.S.C. § 32902(a), (b)(2)(B). NHTSA must take into account technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government (*i.e.*, California and federal vehicular emissions standards), and the need of the United States to conserve energy. *Id*. § 32902(f).

---

[3]Reuters, *Minnesota, New Mexico to adopt California emission standards* (Sept. 25, 2019), https://www.reuters.com/article/us-autos-emissions-california-minnesota/minnesota-new-mexico-to-adopt-california-vehicle-emissions-rules-idUSKBN1WA2SJ; Nevada Department of Environmental Protection, *Clean Cars Nevada*, https://ndep.nv.gov/air/clean-cars-nevada.

EPCA contains a preemption clause relating to fuel economy standards—but that clause does not reference emissions standards, much less standards for which California has a waiver or standards adopted by the Section 177 States. *Id*. § 32919(a).

### C.    Historic Implementation of Emissions Regulations

At one time, differences between federal EPA emissions requirements and the California/Section 177 emissions standards led to a distinction between federally-compliant cars and Section 177-compliant cars. *See*, *e.g.*, *MVMA*, 17 F.3d at 526–27; *see also Colorado Auto. Dealers Ass'n v. Colorado Dept. of Public Health & Env. Et al.*, 2019-cv-30343, *Order Re: Defendant's Motion to Dismiss* (July 8, 2019) ("Colorado Order of Dismissal"; Surdo Decl. Ex. B). Moreover, EPA and NHTSA historically engaged in separate rulemaking processes to set emissions and fuel economy standards, respectively.

That changed in 2010, when the two federal agencies began using joint rulemaking to set standards for *both* greenhouse gas emissions and *also* fuel economy, using fleet averages for both.[4] This "one national program" approach, first adopted for the 2012–2016 model years, allows a single model vehicle to be manufactured and sold nationwide that will meet both greenhouse gas emissions and fuel efficiency targets. 75 Fed. Reg. 25,324 (May 7, 2010) ("manufacturers will be able to build a single light-duty national fleet that satisfies all requirements under both [California/Section 177 and federal] programs while

---

[4] NHTSA, *NHTSA and EPA to Propose Greenhouse Gas and Fuel Efficiency Standards for Medium- and Heavy-Duty Trucks; Begin Process for Further Light-Duty Standards: Fact Sheet* (May 2010), https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/ld_hd_fe_factsheet.pdf.

ensuring that consumers still have a full range of vehicle choices."), 25,332 (Table I.B.2-5 fleet-wide $CO_2$ emissions projections).

This national program approach for greenhouse gas emissions and fuel economy was continued for the 2017–2025 model years. 77 Fed. Reg. 62,630 (Oct. 15, 2012) ("Continuing the National Program in coordination with California will help to ensure that all manufacturers can build a single fleet of vehicles that satisfy all requirements under both federal programs as well as under California's program . . . ."). EPA and NHTSA's standards remain harmonized even today. 84 Fed. Reg. 51,310 (Sept. 27, 2019) (entitled "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program"). To the Defendants' knowledge, and despite MADA's complaints about "California cars," there is no such thing presently on the market (as distinct from federally-compliant vehicles). Kohlasch Decl. ¶¶ 16–20.

### D.   The Trump Administration's Attempts to Roll Back Emissions and Fuel Economy Standards

In September 2019, EPA and NHTSA jointly took action to prevent states from implementing their own GHG and ZEV standards. 84 Fed. Reg. 51,310 (SAFE Part I). In SAFE Part I, EPA purported to rescind parts of California's duly-granted 2013 waiver and reinterpreted Section 177 to preclude other States from adopting or enforcing California's GHG standards. And NHTSA declared that state greenhouse gas and ZEV emissions standards are preempted by EPCA.

In April 2020, EPA and NHTSA finalized SAFE Part II, which resets the federal emissions and fuel economy standards for the 2021–2025 model years. 85 Fed. Reg. 24,174

(April 30, 2020). SAFE Part II purported to amend the standards set in the 2012 joint EPA/NHTSA rulemaking, and instead set new, dirtier, standards for greenhouse gas emissions for 2021 model years and later and less-stringent fuel economy goals for 2022–2026 model years. *Id*.

Minnesota is among petitioners that are seeking review of these actions in the D.C. Circuit Court of Appeals. *See Union of Concerned Scientists et al. v. NHTSA*, D.C. Cir. No. 19-1230; *Competitive Enter. Inst. v. NHTSA*, D.C. Cir. No. 20-1145.[5] These are large, complex, administrative cases with several associated dockets and hundreds of parties represented. The SAFE Part I challenge is fully briefed and is awaiting oral argument. Briefing is underway in the SAFE Part II challenge. In both actions, the State of Minnesota and its co-plaintiffs ask the D.C. Circuit to vacate the actions.

In addition, the SAFE actions are now subject to administrative scrutiny. President Biden issued an Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis on January 20, 2021. Surdo Decl. Ex. A. That order directs the EPA Administrator to consider proposing for notice and comment the suspension, revision, or rescission of the SAFE actions.

Given this changing landscape, and as described in more detail in the next section, the MPCA's proposed rule is *contingent* on resolution of state authority to address vehicle emissions (*i.e.*, if SAFE Part I is legally or administratively abrogated). If the MPCA's

---

[5] Minnesota is one of the plaintiffs in a separate case challenging NHTSA's EPCA preemption aspect of SAFE Part I in the United States District Court for the District of Columbia, which Minnesota alleges is the proper venue. The D.C. District Court case is currently stayed pending the D.C. Circuit Court's decision in D.C. Cir. No. 19-1230.

8

proposed rule is ever finalized, it will go on the shelf and the emissions standards will *not take effect* unless and until Minnesota publishes a notice that its Section 177 authority has been restored.

### E.  MPCA's Proposed (but not yet Adopted) Rule

#### 1.  Minnesota's proposed rule seeks to address climate change and facilitate consumer choice.

To do its part to combat climate change and reduce statewide emissions of greenhouse gasses and other air pollutants, Minnesota proposes to use Section 177 authority to adopt LEV and ZEV programs that will align with national trends toward reducing emissions from the vehicle fleet. Surdo Decl. Ex. C (Statement of Need and Reasonableness (SONAR)). LEVs are vehicles that use traditional internal combustion engines that implement technologies to reduce their emissions. Since 2012, when the federal and California/Section 177 standards were harmonized, all cars sold in Minnesota have met the LEV standards. ZEVs available on the market are predominantly battery-electric cars or plug-in hybrids. The ZEV program is designed to require manufacturers to deliver more zero-emission vehicles into the state so that they are available for customer purchase.

MPCA predicts these relatively straightforward measures will help to accelerate already-popular clean vehicle adoption rates, and greatly reduce greenhouse gas (GHG) emissions:



Surdo Decl. Ex. D. (MPCA Presentation ("Presentation") at 10 (*citing* SONAR at 7)). The proposed rule is also projected to reduce thousands of tons of other harmful air pollutants, prevent hundreds of premature deaths from respiratory and cardiovascular health effects, and generate economic value of avoided health impacts as high as $3.2 billion. *Id* at 12; SONAR at 49.

Electric vehicles are already increasingly popular. Battery and electric motor technologies are evolving rapidly. Charge times, battery life, and range are improving exponentially. The Technical Support Document and SONAR describe a conservative straight-line adoption rate that does not reflect the exponential growth that actually exists in the market, in which electric vehicle adoption rates in Minnesota are nearly doubling every year. SONAR at 47–49, 60; Kohlasch Decl. ¶¶ 38–39. Model options are continuing to expand. *Id*. at ¶¶ 40–43.

Since 2012, most electric vehicles available through new car dealerships in Minnesota have been limited to compact passenger vehicles. Kohlasch Decl. ¶¶ 40–41. But trucks and sport utility vehicles are popular in Minnesota. SONAR at 23. The LEV and ZEV standards are designed to provide flexibility for that consumer choice—trucks remain popular in the other Section 177 states, too. *Id.* at 41–42; Kohlasch Decl. ¶ 43. In the next few years, the market expects a number of electric trucks and sport utility vehicles to be released. Kohlasch Decl. ¶ 42. More and more electric options are in the pipeline. *Id.* One reason for the ZEV program is to facilitate consumer choice for these vehicles by ensuring that manufacturers make them available to Minnesotans—a persistent hurdle in the current market. SONAR at 51; Kohlasch Decl. ¶¶ 28–37.

### 2. The proposed rule is contingent on a valid waiver.

With full knowledge that while SAFE Part I persists, California does not have a waiver, the MPCA's proposed rule (which the ALJ is yet to consider and the agency is yet to adopt) provides that it will not be effective unless authority is restored:



Surdo Decl. Ex. E. (Proposed Rule) at 1:17–22.

11

Notably, Plaintiff misrepresents this critical provision of the proposed rule to the Court—arguing that "MPCA attempts to make an end run around federal preemption by saying it is merely adopting the rules but not enforcing them." Dkt. 15 at 17. That is patently untrue. As seen above, MPCA is not adopting a rule and providing guidance on enforcement. It has drafted the rule in way that prevents it from ever becoming effective unless authority is restored. The SONAR explains that this subpart is designed to ensure that the standards will not become effective "until the waiver issue between California and the EPA is resolved." SONAR at 52. Instead, the rule would become effective "only after the MPCA publishes [an additional] notice to the State Register that would inform the regulated parties and the public that the waiver has been restored." *Id*.

Plaintiff then turns to a further misrepresentation—arguing that the rule will become enforceable five days after it is finalized and published, because it includes an early-action credit mechanism. Proposed Rule at 8:22–9:18. But that mechanism is explicitly not a requirement of any sort. SONAR at 53, 58 ("The early action credit program provides an incentive for manufacturers to voluntarily bring more [electric vehicles] here sooner" even before the ZEV implementation date of the 2025 model year.). The early-action credit program merely allows manufacturers to begin tracking and banking credits for ZEVs that they may voluntarily choose to deliver (or not); but those credits will have no utility unless the rule also becomes enforceable upon restoration of California's waiver. Proposed Rule at 8:22–9:18; SONAR at 53. And, moreover, no manufacturer is required to earn these credits; manufacturers do not even need to open a credit account until the March following the year for which they wish to apply for a credit. *Id*. The credit system "is a *voluntary*

*flexibility* offered to manufacturers, *not a requirement* of the rule." *Id.* (emphasis added). A program that allows for voluntary participation is neither compulsory nor an enforcement mechanism.

Finally, the provision allowing the early action credit program to go into effect five days after rule publication is subject to the upcoming administrative hearing and public comment period. Interested members of the public are free to submit any concerns they have about the program, including concerns about its effective date or enforceability.

### 3. Several steps remain, including public comment, which could change the proposed rule.

Several administrative steps remain before the proposed rule is adopted. Kohlasch Decl. ¶¶ 5–14. The Office of Administrative Hearings will consider the rule and public comment in person on February 22 and 23, or in writing through March 15, 2021. Minn. Stat. § 14.14. There is an additional period of five to 20 days after that for responsive comments. Minn. Stat. § 14.15, subd. 1. The ALJ's report is due 30 days after the close of these comment periods. Minn. Stat. § 14.15, subd. 2. The ALJ presiding over the hearings is free to rule as she sees fit, and the outcome of the hearing and her consideration is unknown. Kohlasch Decl. ¶¶ 9–13. The ALJ can determine that MPCA should not adopt the rule or require or suggest changes to the proposed rule (including the availability date for the early action credit). *Id.*

Depending on the ALJ's decision, the MPCA will still need to run the rule through internal processes. *Id.* And even after that, the Governor's office will review the rule and has the option to reject it or send it back to the agency for further proceedings. *Id.*

13

All of this timing is crucial. The notice of hearing, hearing, and subsequent proceedings need to leave time for the rule to be finalized this calendar year to comply with the Clean Air Act's two-year waiting period:



Presentation at 8; CAA § 177, 42 U.S.C. § 7507 (states must adopt standards "at least two years before commencement" of the model year to which they apply).

This background demonstrates the complex regulatory landscape for vehicle emissions. MPCA's proposed rule is intended to fit within this landscape; its contingencies assure that it is legal at all times (before and after any decision on SAFE Part I).

### III.   ARGUMENT

The Court has two motions before it, one from the Defendants to dismiss the complaint, and a second from Plaintiff for a preliminary injunction. The Court should grant the Defendants' motion to dismiss because the complaint fails to state a cause of action, and because this Court lacks subject matter jurisdiction to hear the complaint even if it did state a claim. The Court should deny the motion for a preliminary injunction for the same reasons, and the additional reasons that Plaintiff has no irreparable harm justifying a preliminary injunction and the remaining *Dataphase* factors favor the Defendants.

## A.      Plaintiff's Complaint Should be Dismissed

Plaintiffs' complaint should be dismissed for four reasons. First, the complaint fails to state a cause of action. While federal preemption principles preclude a state from enforcing an administrative rule that is preempted, they do not preclude a state from adopting a conditional rule that will become effective only if authority is restored. Here, the rule is expressly conditioned on the reinstatement of a federal waiver which negates Plaintiff's argument. Second, because the proposed rule has not yet been adopted, and because it will not become effective unless the related federal waiver is reinstated, Plaintiff's claims are not ripe and not justiciable. Third, Plaintiff lacks standing to challenge the proposed rule because it has no harms directly traceable to the proposed rule. Fourth, the Eleventh Amendment provides immunity to the Defendants on all of the claims pleaded.

The State brings this motion under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Subject-matter jurisdiction is a threshold requirement which must be assured in every federal case. *Kronholm v. F.D.I.C.*, 915 F.2d 1171, 1174 (8th Cir. 1990). "If the asserted basis of federal jurisdiction is patently meritless, then dismissal for lack of jurisdiction is appropriate." *Biscanin v. Merrill Lynch & Co., Inc.*, 407 F.3d 905, 907 (8th Cir. 2005). Similarly, the appropriate relief for a complaint that fails to state a valid cause of action is dismissal. *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

1. **Plaintiff fails to state a claim because the proposed rule will not contravene federal law.**

MPCA is acting now to be prepared with a rule if and when such a rule is once again allowed under federal law. As the *New York Motor Vehicles Manufacturers* case makes clear, states are free to plan for such contingencies so that their rules are prepared and ready to go when the question of authority resolves. *MVMA*, 17 F.3d at 534. There, New York's Department of Environmental Conservation enacted New York's version of the rule even though California's waiver was not in effect. *Id*. That is exactly the case here. The Second Circuit ruled that New York was free to proactively adopt clean car regulations "even though it occurred before California was granted a waiver." *Id*. If a state is free to have a final rule prepared for when a waiver is put into effect, it surely can engage in proceedings to consider whether it should adopt such a rule.

Because the rule is not effective or enforceable until the waiver has been restored, Plaintiff has failed to state a cause of action. If SAFE Part I stands, the MPCA's proposed rule can never spring into effect. And if SAFE Part I falls, the basis for Plaintiff's complaint disappears. And in neither of these outcomes does Plaintiff allege that the Minnesota Administrative Procedure Act, which defines how administrative agencies consider proposed rules and engage in rulemaking, is preempted. Accordingly, Plaintiff has failed to state a cause of action, and the Court should dismiss the complaint.

### 2.      Plaintiff's claims are not ripe.

Plaintiff challenges a rule that has not yet been promulgated. MPCA has issued a *proposed* rule, and a notice of intent to adopt a rule *after* public hearings. This is the epitome of a claim that is not ripe for adjudication.

Ripeness stems from Article III of the U.S. Constitution and "requires that before a federal court may address itself to a question, there must exist 'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" *Neb. Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1037–38 (8th Cir. 2000) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 200 (1983) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49 (1967)). In the administrative context, an issue is generally not ripe for judicial review until there is final agency action. *Murray Energy*, 788 F.3d at 333–34; *Lane v. U.S. Dept. of Ag.*, 187 F.3d, 793, 795 (8th Cir. 1999).

The Declaratory Judgments Act does not do away with the requirement of ripeness. To the contrary, the act still requires there be an "actual controversy." 22 U.S.C. § 2201(a). In a declaratory judgment action, two requirements for ripeness must therefore be met. First, there must exist "a sufficiently concrete case or controversy within the meaning of

Article III of the Constitution." *Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1050 (8th Cir. 1996), *amended* (June 21, 1996) (citations omitted). Second, "prudential considerations must justify the present exercise of judicial power." *Id.* (citations omitted). In other words, there must exist "a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (citing *Caldwell v. Gurley Refining Co.,* 755 F.2d 645, 649 (8th Cir.1985)). Here, Plaintiff cannot meet either requirement for ripeness.

At present, there is no ripe controversy between MPCA and Plaintiff for this Court to resolve. With respect to whether the proposed rule can go into effect without the reinstatement of California's waiver, there is no controversy (ripe or otherwise) because the relevant legal points are undisputed. The parties agree that if the waiver is not reinstated, Section 177 authority will not exist and the rule will not go into effect. Indeed, the rule explicitly recognizes this and does not become effective by its own terms unless the waiver is reinstated. As a result, there is no risk of conflict between the proposed rule and federal law, and no controversy for the Court to resolve. Similarly, if the waiver is reinstated, the basis for Plaintiff's complaint disappears. As Plaintiff concedes in its complaint, "[o]ther states that meet certain qualifications may adopt regulations 'identical to the California standards." Dkt. 1 ¶ 27. And there is no dispute that states are free to prepare for the day when authority will be granted. *MVMA*, 17 F.3d at 526–27. In short, there is no reason (or constitutional authority) for the Court to weigh in on a federal preemption issue where the proposed rule explicitly states that it will only become effective if the waiver is reinstated.

No doubt recognizing that the contingency obviates any justiciable controversy, Plaintiff attempts to manufacture one from the proposed rule's early action credit. This argument fails for a number of reasons. First, the early action credit program does not set any emissions standards without other aspects of the rule in effect—the program just allows manufacturers to count their sales. Merely keeping count does not actually set any emissions standards that would require a valid waiver.

Second, the proposed rule is not yet final, and Plaintiff has the opportunity to take whatever concerns it has about the early action credit in the proposed rule to the ALJ for consideration by the MPCA in the rulemaking. The final rule may or may not include the early action credit. Any challenge to this feature of the rule is therefore premature and unripe. *Murray Energy*, 788 F.3d at 333–34.

*Murray* is squarely on point. In *Murray*, EPA was considering the adoption of a proposed rule proscribing emission guidelines for greenhouse gas emissions from existing power plants. *Id.* at 402. While the proposed rule was still being reviewed by EPA, the petitioners filed suit in the D.C. Circuit Court of Appeals to block it.[6] *Id.* at 403. The court quickly disposed of the claim—opening its opinion with the following rebuke:

> Petitioners are champing at the bit to challenge EPA's anticipated rule restricting carbon dioxide emissions from existing power plants. But EPA has not yet issued a final rule. It has issued only a proposed rule. Petitioners nonetheless ask the Court to jump into the fray now. They want us to do something that they candidly acknowledge we have never done before:

---

[6] Under the federal scheme, certain challenges to agency rulemaking must be brought directly in the D.C. Circuit Court of Appeals.

review the legality of a *proposed* rule. But a proposed rule is just a proposal. In justiciable cases, this Court has authority to review the legality of final agency rules. We do not have authority to review proposed agency rules. In short, we deny the petitions for review and the petition for a writ of prohibition because the complained-of agency action is not final.

*Id.* at 333–34.

Third, even if the final rule includes the early action credit program in its present form, determining the issue would require the Court to resolve several contingent factual contentions of the Plaintiff—making it unfit for resolution through a declaratory judgment action. *See Pub. Water Supply Dist. No. 10 v. City of Peculiar*, 345 F.3d 570, 573 (8th Cir. 2003) (stating that cases based on contingent facts are unripe).

A long line of federal cases hold that for an issue to be ripe for a declaratory judgment action, it must be "fit" for judicial resolution through the forward-looking mechanism of declaratory judgment. *See*, *e.g.*, *id.*; *Nat'l Right to Life Political Action Comm. v. Conner,* 323 F.3d 684, 692–93 (8th Cir. 2003); *Paraquad, Inc. v. St. Louis Hous. Auth.,* 259 F.3d 956, 958–59 (8th Cir. 2001). This is a two-part analysis in which courts look at how susceptible the issue is to resolution, and balance that against whether there are substantial hardships to a plaintiff that can be avoided through an early declaration. *Pub. Water Supply Dist. No. 10*, 345 F.3d at 573. Courts recognize that there is a disadvantage to resolving disputes through declaratory judgment actions that hinge on contingencies or threatened harms—particularly where the dispute may involve fact questions. *Id.* As a result, courts strive to avoid taking up such theoretical disputes through

a declaratory judgment action where the case is better left to resolution once the contingencies and factual questions are sufficiently developed to bring them into relief. *Id.*[7]

Here, Plaintiff's argument about the impact of the early action credit program are exactly the type of speculative, contingent claims that federal courts avoid resolving through a declaratory judgment action. *Id.* Even if legally cognizable, Plaintiff's alleged harm from the early action credit program remains subject to myriad undeveloped contingencies. The harm will occur only *if* the proposed rule is adopted, and *if* it is unchanged despite public comment, and *if* the final version ultimately includes an early action credit program, and *if* car manufacturers then seek to voluntarily participate in the early action credit program, and *if* the manufacturers have contracts allowing them to force dealers to take (purportedly) unwanted clean cars, and *if* the clean cars end up not meeting customers' demand, and *if* the dealers cannot actually sell the cars they are forced to take, and *if* the inventory lingers for 60, 90, or even 200+ days, and *if* the dealers have a floor plan loan on which they paying interest, and *if* manufacturer floor plans credits expire or lapse, and *if* the unsold inventory goes into curtailment, and *if* a sufficient number of vehicles go into curtailment that it materially ties up capital reserves. *See* Dkt. Nos. 17–23 (dealer affidavits) at *passim* (complaining of byzantine preexisting debt arrangements that dealerships already have in place with their manufacturers and financers).

---

[7] Plaintiff's complaint contains only a bare allegation of harm flowing from the early action credit that fails to explain how the early action credit program—which applies to manufacturers, not dealers—would adversely impact dealers. Dkt. 1 ¶ 56. Plaintiff's motion papers lay out its argument of myriad contingencies.

Moreover, at least two of the links in Plaintiff's convoluted chain of contingencies have nothing to do with MPCA or the proposed rule. The rule does not require dealers to take cars they do not want. The dealers' complaint, at bottom, is that they have *existing* business arrangements under which that *already* happens.[8] The dealers' harm therefore flows from their own contracts and business affairs, not the proposed rule. If the dealers rely on an (allegedly) abusive debt-financing arrangement, their harm flows from that arrangement, not the rule.

Plaintiffs have failed to plead or demonstrate any hardship that would justify this Court taking on such speculative set of claims through a declaratory judgment action. On the "hardship" prong, an "[a]bstract injury is not enough." *Id.* (citing *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974)). A plaintiff must allege it "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *Id.* Here, Plaintiff concedes it has not yet been damaged by the

---

[8] Plaintiff's complaint fails to explain its claim that dealers *must* purchase the cars that manufacturers send them. Its affidavits show that allegation is not supported. Plaintiff's motion papers imply the requirement is contractual, relying on the affidavit of Scott Lambert: "Importantly, when a manufacturer 'delivers' a vehicle to a dealer, the dealer must purchase it from the manufacturer." Dkt. 15 (P.I. Mem.) at 4.  But Lambert's affidavit does not actually say that. Instead, it actually states the dealers are the "<u>exclusive</u> buyers" of any vehicles the manufacturers deliver for sale and that if "a manufacturer is required by law to deliver certain vehicles in Minnesota, it must *find a way* to force dealers to buy those vehicles from them for sale to customers."  Dkt. 20 (Lambert Aff.) at ¶ 6. Lambert is thus speculating about what manufacturers might do in the future, not what they presently have the power to do.  None of the affiants put any actual franchise contract into evidence. And some outright confirm that manufacturers *cannot* force them to buy anything. *E.g.*, Dkt. 18 (Erickson Aff.) at ¶ 13 ("The manufacture [sic] cannot force me to choose certain inventory."). What power the manufacturers actually have over the dealers is therefore uncertain, and Plaintiff's legal arguments are not supported by its proffered evidence.

early action credit, and it has not pleaded or shown it is "immediately" in danger of sustaining any direct injuries from MPCA's conduct. Instead, Plaintiff concedes that its members' alleged injuries (if they happen) would be indirect. They would result from actions that dealers predict car manufacturers may voluntarily take of their own accord to claim early action credits.

In sum, this case does not yet present a case or controversy ripe for adjudication by an Article III court. It is unlikely that it ever will, given that the proposed rule expressly states it will become effective only if the CAA waiver is reinstated. And at present, there is no controversy at all, because the rule is still just a proposal. This Court should dismiss Plaintiff's claims.

### 3.    Plaintiff and its members lack standing.

This is not the first time an automobile dealer association has sued to block implementation of auto emission regulations. If the proposed rule is adopted, Minnesota will join fourteen states and the District of Columbia in promulgating nearly identical rules. These rules have been challenged before, and courts have held that auto dealers lack standing to contest them. *New York State Auto. Dealers Ass'n v. New York State Dept. of Envtl. Conservation*, 827 F. Supp. 895 (N.D.N.Y. 1993); *Colorado Order of Dismissal*, No. 2019-cv-30343 at 4.

"Whether a plaintiff has standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" *McClain v. Am. Econ. Ins. Co.*, 424 F.3d 728, 731 (8th Cir. 2005) (quoting *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000)). "The 'irreducible constitutional minimum of standing' is that a plaintiff

show (1) an 'injury-in-fact' that (2) is 'fairly . . . trace[able] to the challenged action of the defendant' and (3) is 'likely . . . [to] be redressed by a favorable decision' in court." *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The alleged injury-in-fact must be "(a) concrete and particularized" and "(b) 'actual or imminent,'" as opposed to "'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "A party invoking federal jurisdiction has the burden of establishing standing 'for each type of relief sought.'" *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

Plaintiff alleges that its members will suffer two injuries from the rule being adopted in the currently proposed form: that they will lose sales from stocking "only California compliant vehicles" and that they will incur costs from stocking increased numbers of ZEVs. Dkt. 1 ¶ 17. But these asserted harms are too hypothetical to establish "actual or imminent" harm needed for standing.

The "California cars" issue is a red herring in three ways. First, as discussed above, (*supra* Part II.C.), there is currently no such thing as a "California car." Right now, all vehicle fleets meet both California and federal emissions standards and that may well remain true if the waiver is reinstated. At best, Plaintiff can claim that in some future unknown scenario "California cars" may again become a thing, as they were in the past. Speculative harms about future uncertain scenarios do not confer standing to sue. *Summers*,

555 U.S. at 495–96 (concluding that accepting uncertain harms would be "tantamount to eliminating the requirement of concrete, particularized injury in fact").

Second, even if "California cars" did exist, there is no direct economic harm flowing from the existence of such cars sufficient to confer standing. As the Court in *New York State Auto. Dealers Ass'n* observed, the problem is not one of interstate competition. 827 F. Supp. at 901–02. The proposed rule prohibits the registration of new automobiles that do not meet the relevant emissions standard, irrespective of where they are sold. SONAR at 64. As a result, Minnesota dealers will be at no disadvantage to dealers just across the border, because those dealers would have to stock "California cars" (if such a thing existed) if they want to sell to Minnesota residents. Third, as for Plaintiff's vague generalized claims that it will be harder for the dealers to trade with out-of-state dealers, the claim is speculative and the harm does not flow directly from the regulation but instead from the dealers' business practices. *New York State Auto. Dealers Ass'n*, 827 F. Supp. at 899–900. Put another way, there is no direct harm to the dealers in having to sell cleaner cars, only a speculative assertion that they will have to change elements of the way they do business and be harmed as a result. This is insufficient to confer standing.

Unlike the "California cars" issue, the ZEV program will be a real requirement for manufacturers to meet, but it also does not create standing for dealers to sue the State. The mandate is imposed on manufacturers, not dealers. Plaintiff claims that manufacturers might voluntarily try to make dealers take ZEVs. But nothing in the proposed rule creates

this harm—which, if it ever exists, flows from the dealers' contracts.[9] Plaintiff's members cannot create Article III standing by signing contracts with manufacturers, then complaining about the impacts of those contracts. Plaintiff's ZEV claim more or less boils down to the allegation that manufacturers will try to get dealers to dedicate 7.5% of their lot space to ZEVs and make investments to sell them. The claim that this will create harm is, at best, speculative.

Because Plaintiff's alleged injuries are purely speculative and do not flow directly from the proposed rule, they cannot be considered the type of actual, imminent, concrete, and particularized injuries sufficient to establish standing.

### 4. Plaintiff's suit is barred by the Eleventh Amendment.

While somewhat unclear, it appears Plaintiff has named three Defendants in this action—the State of Minnesota, MPCA, and MPCA Commissioner Bishop in her official capacity.[10] Two of these parties, the State and MPCA, have complete Eleventh Amendment immunity, and must be dismissed as Defendants. *Will v. Michigan*, 491 U.S. 58, 66 (1989) (noting general prohibition of suits in federal court by a citizen of a state against his state); *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (same).

---

[9] Incredibly, Plaintiff complains that manufacturers are prohibited by law from selling cars directly to Minnesota residents, forcing dealers to carry water for the manufacturers. Dkt. 1 ¶ 51. But it was the dealers generally, and Plaintiff specifically, who got this legal restriction passed—a restriction Plaintiff continues to vigorously defend and seeks to expand. *See* https://www.mada.org/news/recent-news/81.

[10] There is some ambiguity in the Plaintiff's pleading of the Defendants. It is clear that Plaintiff is suing MPCA and Commissioner Bishop. Dkt. 1 ¶ 12. It is unclear whether Plaintiff is also suing the State as a Defendant.

As for Commissioner Bishop, she likewise has Eleventh Amendment immunity because the narrow *Ex parte Young* exception for prospective, non-monetary relief directed to State officials in their official capacities does not apply here. *See id.* (describing exception). *Ex parte Young* only applies against officials who threaten and are about to commence enforcement proceedings against a defendant. *281 Care Comm. v. Arneson*, 766 F.3d 774, 797 (8th Cir. 2014). It "does not apply when the defendant official has neither enforced nor threatened to enforce the" statute or rule the defendant challenges. *Id.*

Commissioner Bishop is not about to "commence proceedings" to enforce the proposed rule against Plaintiff or its members. The rule is not yet final. And even if the rule becomes final, it will not become effective unless and until the related federal waiver is restored. And even if the rule is final and the waiver is restored, it would only regulate manufacturers, not dealers. There are no pending or imminent enforcement proceedings by Commissioner Bishop against the auto dealers—Plaintiff's members.

This Court has emphasized that officials who are not about to commence proceedings against the plaintiff are immune from suit. *See Greene v. Dayton*, 81 F. Supp. 3d 747, 752 (D. Minn. 2015) (dismissing suit on Eleventh Amendment grounds because plaintiffs failed to allege that the State was about to commence proceedings) (citing *North Dakota v. Swanson*, Civil No. 11–3232 (SRN/SER), 2012 WL 4479246, at *18–19 (D. Minn. Sept. 30, 2012) (same); *Advanced Auto Transp., Inc. v. Pawlenty*, Civil No. 10–159 (DWF/AJB), 2010 WL 2265159, at *3 (June 2, 2010) (same)).

The Eleventh Amendment concern here is not illusory. *Ex parte Young* is grounded in a limited "fiction"—that where a state official is violating (or imminently about to

violate) a right secured by federal law, the State official's action is not authorized by state law and the official is not acting on behalf of the state. *See*, *e.g.*, *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 174 (1996). Federal courts limit this fiction to situations in which there is an imminent threat to a federally secured right. *281 Care Comm.*, 766 F.3d at 797. In absence of an imminent threat to a federally secured right, the fiction does not exist, and the *Ex parte Young* doctrine does not apply. *Id.*

### B. Plaintiff's Motion for a Preliminary Injunction Should be Denied.

Even if the Court does not dismiss this case, Plaintiff cannot meet the high burden of establishing that a preliminary injunction is warranted—particularly where there will be no harm from the administrative hearings Plaintiff seeks to enjoin.

When determining whether a preliminary injunction is warranted, a district court considers four factors: (1) the probability that the movant will succeed on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between this harm and the injury that the injunction will inflict on other parties, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). A preliminary injunction is an "extraordinary remedy," and the moving party bears the burden of establishing the need for a preliminary injunction. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "While the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied, a finding of a likelihood of success on the merits only justifies preliminary relief if there is a risk of irreparable harm and the balance of the factors support an injunction." *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). The purpose of a preliminary injunction is

to "preserve the relative positions of the parties until a trial on the merits can be held."
*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Paisley Park Enterprises, Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1043 (D. Minn. 2017).

It is black-letter law that speculative injury is insufficient to justify a preliminary injunction. *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894–95 (8th Cir. 2013); *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999). The Court does not need to entertain any other factors if the moving party fails to sufficiently establish irreparable harm. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987). The moving party's failure to show irreparable harm absent an injunction is sufficient to warrant denial of a request for preliminary injunctive relief. *Id.*; *see also Angelica C. v. ICE*, No. 20-CV-913 (NEB/ECW), 2020 WL 3441461 at *12 (D. Minn. June 5, 2020), *report and recommendation adopted*, No. 20-CV-913 (NEB/ECW), 2020 WL 3429945 (D. Minn. June 23, 2020) (citing *Gelco*); *Jackson v. Macalester Coll.*, 169 F. Supp. 3d. 918, 921 (D. Minn. 2016) (same).

### 1.   Plaintiff does not meet its burden of demonstrating any likelihood of success on the merits.

For the reasons set forth above, Plaintiff has failed to state a cause of action and cannot establish subject matter jurisdiction in this Court. Plaintiff therefore has no reasonable prospect of succeeding with the merits of its claims, and its motion for a preliminary injunction can and should be denied on this basis alone. *See Planned Parenthood v. Rounds*, 530 F.3d 724, 732–33, 732 n.6 (8th Cir. 2008) (likelihood of success is a "threshold" requirement for a preliminary injunction to issue). The lack of

likelihood of success can be "the most influential factor" for denying a preliminary injunction. *Scott v. Minnesota State High Sch. League*, No. 16-CV-4148 (MJD/HB), 2016 WL 7735565, at *10–11 (D. Minn. Dec. 27, 2016), report and recommendation adopted sub nom. *Maki v. Minnesota State High Sch. League*, No. 16-CV-4148 (MJD/HB), 2017 WL 114078 (D. Minn. Jan. 11, 2017).

### 2.    Plaintiff will not be irreparably harmed.

There are several defects in Plaintiff's claims of irreparable harm to support its motion for a preliminary injunction. One is already discussed above, (*supra* part III.A.2.), and will not be repeated here. There is no possibility of any legally cognizable harm to Plaintiff from the proposed rule because it will not go into effect until SAFE Part I is abrogated and the related federal waiver is reinstated—in which event Plaintiff will have no viable legal claim.

There are also significant failures of proof on Plaintiff's contention that auto dealers will be harmed by the adoption of the proposed rule. Before addressing those failures, two other issues must be noted.

First, there is a fatal disconnect between the harms Plaintiff seeks to avoid, which allegedly flow from the rule becoming effective, and the actions Plaintiff presently seeks to enjoin—administrative hearings that are part of the rulemaking process. Plaintiff's complaint and motion papers focus almost exclusively on allegations that auto dealers will be harmed if the rule becomes effective. Dkt. 1 ¶¶ 45–64; Dkt. 15 at 17–19. Plaintiff's complaint nowhere pleads that its members will be harmed by the administrative hearings. Its moving papers contain only a bare assertion that "MADA's members will not be able

to recover . . . the costs of participating in the rulemaking when the new rules are determined to be invalid as preempted." Beyond presupposing that SAFE Part I will survive, this statement is unsupported by *any* evidence. Plaintiff put seven dealer affidavits into the record. Not a single one references any actual costs that have been or will be expended by the dealers to participate in the administrative hearings. Nor does Plaintiff contend that such costs are *damages* such that there should be an avenue for their recovery (they are not).

In lieu of actual evidence, Plaintiff cites to *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996), *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984), *Pub. Utilities Comm'n v. United Fuel Gas Co.*, 317 U.S. 456, 468 (1943), *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472–73 (8th Cir. 1994), and *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 418 (8th Cir. 1985). But none of these cases apply. *Iowa Utilities Board* and *Pennhurst* do not even come close to holding that merely participating at the agency level is a harm. And the *Public Utilities Commission* case related to enforcement of an *existing* Ohio statute, not an injunction against the process that led to its passage. 317 U.S. 456. In that case, the existing state statute predated enactment of a federal National Gas Act of 1938. *Id*. at 459–61. The *Baker Electric* case is also completely inapposite. 28 F.3d 1466. It did not decide preemption at all; it remanded with directions for the District Court to assess the issue. *Id*. at 1476. While the Eighth Circuit did restore an injunction, (*id*. at 1472–73), it did so based on interruption of electrical service, not federal preemption. It does not discuss whether any party was harmed by an in-process-but-not-final rulemaking. *Id*. On remand, the district court did not resolve the questions of

preemption nor did it address any irreparable harm. *Devils Lake Sioux Indian Tribe v. N. Dakota Pub. Serv. Comm'n*, 896 F. Supp. 955, 961–62 (D.N.D. 1995).

*Middle South Energy* is equally inapposite. The threatened state action—voiding energy contracts—was imminent, would have been effective upon execution, *and* would have violated the federal commerce clause. *Middle S. Energy, Inc.*, 772 F.2d at 413. There, the Eighth Circuit collected cases that required a present threat or certain-impending injury in which there was only a "remote" chance that remaining state actions would avoid preemption issues. *Id*. The case did not involve a proposed state action that was contingent like the one Plaintiff challenges here—where the state action will not be effective unless and until the state receives federal authority for it. *Id*. These cases do not support an assertion that participation in a rulemaking process is a cognizable harm even if the rule *could* be theoretically invalidated. And in the meantime, it remains black-letter law that proposed agency actions may not be enjoined. *Murray Energy*, 788 F.3d at 333–34.

Second, none of the harms Plaintiff cites are imminent, nor are they relevant to a motion for preliminary injunction. "Irreparable injury" in the preliminary injunction context means an irreparable injury that would occur *before* there can be a full adjudication of the case on the merits. *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "If a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief." *Id. citing* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 11A *Federal Practice & Procedure* § 2948.1, at 149 (2d ed. 1995). The Court does need not entertain any other *Dataphase* factors if Plaintiff cannot demonstrate

that it will suffer an irreparable harm before the merits of its claim can be adjudicated. *Gelco*, 811 F.2d at 420; *Paisley Park*, 253 F. Supp. 3d at 1048.

Turning to the harms that Plaintiff claims it will suffer once (or if) the proposed rule is implemented and enforced, Plaintiff still supplies no evidence of any concrete or particularized harm that will actually come to pass, all while demonstrating a profound and troubling lack of understanding of the proposed rule and ZEV marketplace. Plaintiff's moving papers fail to establish *any* of the harms that it complains about:

- **Manufacturer "encouragement:"** Plaintiff complains that manufacturers *can* encourage dealerships to accept stock that they do not want. But its affidavits never say that *will* happen. Indeed, there is no early action credit in the LEV program; it applies only to ZEV. And even then, the proposed rule does not regulate dealership-manufacturer business arrangements. Dealers may not like the dynamic that exists between them and manufacturers, but that dynamic already exists—it is not a mandate of the proposed rule. Plaintiff supplies no evidence that the proposed rule requires encouragement, much less that manufacturers will engage in it. Plaintiff does not meet its burden to establish this imminent harm.

- **Consumer choice:** Plaintiff complains that Minnesotans prefer trucks and sport utility vehicles, intimating that it does not want its dealers to be forced to carry less-desirable vehicles. But again, the early action credit does not even apply to LEVs. And if Plaintiff is concerned about ZEVs, Plaintiff supplies no evidence that the raft of forthcoming electric trucks and sport

utility vehicles will be unpopular. *Supra* Part II.C. To the contrary, its dealers are preparing to sell them.[11] Plaintiff does not meet its burden to establish this imminent harm.

- **Financial losses:** Plaintiff's legal brief asserts that if the rule is adopted, its dealers *will* suffer financial loss yet none of its submissions to support that assertion. *Compare* Dkt. 15 (P.I. Mem.) at 17 *with* Dkt. 17–23 (speculative affidavits that fail to contain any assertion that dealerships will actually lose money). Plaintiff does not meet its burden to establish this imminent harm.

- **Goodwill:** Plaintiff's brief also complains that its dealerships will lose goodwill. Dkt. 15 (P.I. Mem.) at 18. That is a fabrication. None of the affidavits it supplies says one word about goodwill or how it might be diminished. *Compare id. with* Dkt. Nos. 17–23 (not one mention of goodwill) Plaintiff does not meet its burden to demonstrate this form of imminent harm.

---

[11] Plaintiff's members "have already embraced efforts by manufacturers to sell hybrids and ZEVs." Dkt. 15 (P.I. Mem.) at 5 (*citing* Dkt. 18 (Erickson Aff.) ¶ 50 *and* Dkt. 21 (Lockwood Aff.) ¶¶ 40– 44). Mr. Stanzak notes that Key Cadillac "fully supports" migration to an all-electric fleet, and that the market is migrating to electric vehicles. Dkt. 22 (Stanzak Aff.) at ¶¶ 10-12. Plaintiff members are committed to selling the Ford Mach E Mustang, the GMC Humvee, and the Cadillac Lyriq when they arrive. Dkt. 15 (P.I. Mem.) at 5-6 (*citing* Ciccarelli Aff. ¶ 38; Erickson Aff. ¶ 51; House Aff." ¶¶ 41–50; Lockwood Aff. ¶¶ 40–44; Stanzak Aff. ¶¶ 10–13; Whitaker Aff. ¶ 43). These affidavits support the notion that the electric vehicle revolution is underway. Product rollouts are snowballing and customer acceptance is increasing. Minnesotans should have access to these products.

- **Beacons:** Plaintiff's brief further argues that dealerships will lose access to popular models "capable of serving as a beacon" to attract customers, and therefore lose customers, and therefore lose sales—but again, absolutely none of that potential chain of events appears in any of the dealer affidavits. *Compare* Dkt. 15 (P.I. Mem.) at 19 *with* Dkt. Nos. 17–23 (no reference to beacons). Plaintiff does not meet its burden to establish this imminent harm.

- **"California cars:"** Plaintiff complains that dealers will lose business to neighboring states, that "California cars" are more expensive, and that transporting "California cars" to other Section 177 states is prohibitively expensive. But there is no such thing as a unique "California car" in the current market. *Supra* Parts II.C, III.A.3; Kohlasch Decl. ¶¶ 16–20. And again, the Minnesota LEV standard does not even go into effect until the 2025 model year. *Id*. ¶ 22. Plaintiff does not meet its burden to demonstrate this alleged imminent harm.

- **Participating in the hearing and public comment period:** Plaintiff complains that it will need to participate in the regulatory process. That is not a harm, nor does it create it any form of legally-cognizable claim for damages. *Cf. Murray* Energy, 788 F.3d at 333–34; *MVMA*, 17 F.3d at 534. Plaintiff and its member dealers, as members of the interested public, are free to participate or not. Public participation is an option under the Minnesota Administrative Procedure Act, and no harm flows from abiding by it.

Plaintiff does not meet its burden to demonstrate that participating is an imminent harm that requires redress.

Because the failure to establish the threat of irreparable harm is sufficient to deny Plaintiff's motion for a preliminary injunction, the Court need not analyze Plaintiff's request any further. But even if the Court turns to the balance of harms, or public interest, Plaintiff fares no better.

### 3.   The balance of harms favors denying the injunction.

This rulemaking is now nearly two years in process and slated to be complete in 2021. Disrupting its trajectory—perhaps even requiring the rulemaking process start over—will waste precious public resources and time.

Plaintiff argues that since the proposed regulations that will not be applicable to the 2025 model year (sold as soon as the 2024 calendar year), it leaves plenty of time to pass regulations in 2021 even if the injunction is granted. Dkt. 15 (P.I. Mem.) at 21–22. Not so. The Clean Air Act imposes a two-year lead time, and that is what the proposed rule adopts. *Supra* Part II.E.1. Counting backwards from 2024 (the 2025 model year will go on sale in the fall of 2024), the rule needs to be on the books and effective in 2021 to start the model-year clock in 2022. *Id*. With the ALJ hearing requiring advance notice, intense public scrutiny and public participation, and several steps left to go, there is no room to delay the process. Enjoining the hearing will require a number of timelines to be reset—all at the risk at missing an entire year of compliance and the increased emissions from the vehicles sold in that time over their entire lives on the road, well over a decade. The relative harms favor allowing the MPCA to proceed.

Having the proposed rule ready to go on a schedule that complies with the Clean Air Act's statutory requirements favors denying the injunction. This is consistent with the Second Circuit's *MVMA* approach.

### 4. The public interest favors allowing the administrative hearing to proceed.

The climate crisis is apparent. Cities, states, the nation, and the world need to act swiftly to curb carbon emissions. This is, literally, a matter of great public interest and national importance. *See*, *e.g.*, Surdo Decl. Ex. A.

The public comment period for the Notice of Intent to Adopt a Rule with Hearing generated over 100 participants. Public meetings and presentations throughout the state have produced widespread support and some criticism, and MPCA expects the public to submit their concerns and comments for consideration.

The public interest in participating in the upcoming hearing—whether the public opposes or supports the proposed rule or certain aspects of it—cannot be overestimated. There is public interest in having a say, and the hearing should move forward.

## IV. CONCLUSION

For the reasons set forth above, the Court should grant the Defendants' motion to dismiss, and irrespective of its ruling on the motion to dismiss, deny Plaintiff's motion for a preliminary injunction.

Dated:  January 25, 2021                    Respectfully submitted,

                                            KEITH ELLISON
                                            Attorney General
                                            State of Minnesota

                                            /s/ **Peter Surdo**
                                            PETER SURDO (#0339015)
                                            Special Assistant Attorney General

                                            LEIGH CURRIE (#0353218)
                                            Special Assistant Attorney General

                                            OLIVER J. LARSON (#0392946)
                                            Assistant Attorney General

                                            445 Minnesota Street, Suite 1400
                                            St. Paul, Minnesota 55101-2131
                                            (651) 757-1061
                                            peter.surdo@ag.state.mn.us
                                            leigh.currie@ag.state.mn.us
                                            oliver.larson@ag.state.mn.us

                                            ATTORNEYS FOR DEFENDANTS