UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Auto Dealers Association, | Case No. 21-cv-0053 (WMW/ECW) |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| State of Minnesota, *by and through the Minnesota Pollution Control Agency*, and Laura Bishop, *as Commissioner of the Minnesota Pollution Control Agency*, | |
| Defendants. | |

This matter is before the Court on Plaintiff's expedited motion for a preliminary injunction and Defendants' motion to dismiss Plaintiff's complaint.  (Dkts. 13, 28.) Three third-party organizations also seek to intervene as Defendants in this case.  For the reasons addressed below, Defendants' motion to dismiss is granted and this matter is dismissed without prejudice for lack of subject-matter jurisdiction.   Consequently, Plaintiff's expedited motion for a preliminary injunction and the pending motion to intervene are denied as moot.

## BACKGROUND

Plaintiff Minnesota Auto Dealers Association (MADA) is a Minnesota corporation that advocates for the interests of retail motor vehicle dealerships in Minnesota. Defendant State of Minnesota, by and through the Minnesota Pollution Control Agency (MPCA), is a state governmental agency authorized to regulate air quality in Minnesota. Defendant Laura Bishop is the Commissioner of the MPCA.

MADA commenced this action seeking to enjoin Defendants from engaging in administrative rulemaking pertaining to motor vehicle greenhouse gas emissions standards in Minnesota. Defendants' rulemaking conduct, MADA alleges, is preempted by two federal laws: the Clean Air Act, 42 U.S.C. §§ 7521–54, 7581–90, and the Energy Policy and Conservation Act (EPCA), 49 U.S.C. § 32902. It is undisputed that the Clean Air Act prohibits any state from adopting new motor vehicle emission standards that differ from those established under the Clean Air Act. *See* 42 U.S.C. § 7543(a). However, the Environmental Protection Agency (EPA) may waive the express preemption of state regulations for California and, thereafter, other states may adopt regulations that are identical to California's standards. *See* 42 U.S.C. §§ 7507, 7543(b)(2). In addition, the EPCA governs federal fuel economy standards for automobiles and preempts state laws or regulations pertaining to such standards. *See* 49 U.S.C. §§ 32902, 32919.

On September 27, 2019, the EPA revoked California's then-existing Clean Air Act preemption waiver, thereby invalidating California's motor vehicle emission standards. *See* 84 Fed. Reg. 51,310 (Sept. 27, 2019). In addition, the EPA and the Department of Transportation's National Highway Traffic Safety Administration (NHTSA) concluded that the EPCA, which governs fuel economy standards, also preempts motor vehicle *emissions* standards. *Id.* Several states, including Minnesota, have challenged these administrative actions in litigation that currently is pending before the United States Court of Appeals for the District of Columbia Circuit. *See Competitive Enter. Inst. v. NHTSA*, No. 20-1145 (D.C. Cir.); *Union of Concerned Scientists v. NHTSA*, No. 19-1230

(D.C. Cir.).   In addition, the current presidential administration is considering suspending, revising, or rescinding the administrative actions of the prior presidential administration that pertain to fuel economy and motor vehicle emissions standards.  *See* Exec. Order No. 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021).

In or about October 2019, Defendants published a request for comments on proposed rules governing motor vehicle emissions standards in Minnesota based on California's emissions standards.  Defendants' request for comments acknowledges that "[a]ny final rule in Minnesota would need to be made contingent on restoration of the state's ability to adopt these measures, including the existence of operative waiver authority under . . . the Clean Air Act."  On December 21, 2020, Defendants published the proposed motor vehicle emissions rules in the Minnesota State Register and scheduled public hearings to occur on February 22 and 23, 2021.  The proposed emissions rules provide that, except for Part 7023.0300, subpart 4 (the Early Action Credit Provision), the rules will become effective only "after the [California] standards incorporated by reference . . . are granted a waiver by the U.S. Environmental Protection Agency under [the Clean Air Act]."   In a Statement of Need and Reasonableness (SONAR) dated December 14, 2020, Defendants similarly assert that the proposed emissions rules will "not go into effect until the waiver issue between California and the EPA is resolved," and that "even then, the rule[s] would become effective only after the MPCA publishes a notice to the *State Register* that would inform the regulated parties and the public that the waiver has been restored."  The SONAR also contends that, because the Clean Air Act requires state emission standards to be adopted at least two

years before the vehicle model year to which the standards will apply, compliance with Defendants' proposed emissions rules, if adopted, would not be required until at least two years after their effective date.

Although Defendants' proposed emissions rules have an effective date that is delayed indefinitely and contingent on the resolution of the ongoing federal preemption waiver dispute between California and the EPA, the Early Action Credit Provision in Defendants' proposed rules will go into effect earlier.  Specifically, according to the SONAR, "[t]he early action credit mechanism would go into effect five working days after the MPCA publishes a Notice of Adoption in the *State Register* following completion of the rulemaking process."  Under the Early Action Credit Provision, motor vehicle manufacturers may begin to accrue credits for zero-emission vehicles delivered for sale in Minnesota *before* the Defendants' proposed emissions rules go into effect. Defendants' SONAR provides that "the early action credit system is a voluntary flexibility offered to manufacturers, not a requirement of the rule," and the intent of the Early Action Credit Provision "is to offer an early incentive to manufacturers to deliver [electronic vehicles] to Minnesota sooner than required by the rule."

MADA commenced this action on January 6, 2021.  MADA alleges that Defendants' proposed emissions rules are preempted by federal law and, as such, Defendants' ongoing rulemaking conduct is illegal.  According to MADA, Defendants' illegal rulemaking conduct threatens imminent harm to MADA because its members will "(1) lose sales if they can stock and sell only California compliant vehicles and (2) incur costs from stocking increased numbers of [zero-emission vehicles]."  Count One of

MADA's complaint seeks an order enjoining Defendants from attempting to regulate motor vehicle emissions standards in violation of the preemption provisions of the Clean Air Act and the EPCA. Count Two and Count Three of MADA's complaint seek a declaratory judgment that Defendants lack the authority to regulate motor vehicle emissions standards because of the preemption provisions of the Clean Air Act and the EPCA, respectively.

On January 8, 2021, MADA moved for expedited preliminary injunctive relief, seeking an order preliminarily enjoining Defendants from conducting rulemaking proceedings pertaining to Defendants' proposed emissions rules, including the public hearings scheduled to occur on February 22 and 23, 2021. On January 25, 2021, Defendants moved to dismiss MADA's complaint, arguing that MADA lacks standing, MADA's claims are not ripe for judicial review, and the complaint fails to state a claim on which relief can be granted. In the alternative, Defendants contend that MADA has not satisfied its burden to establish that a preliminary injunction is warranted.

On February 16, 2021, three third-party organizations—the Minnesota Center for Environmental Advocacy, Fresh Energy, and MN350 (collectively, "Proposed Intervenors")—moved to intervene as Defendants in this case to protect their interests in ensuring the adoption of Defendants' proposed emissions rules.

## ANALYSIS

### I.     Defendants' Motion to Dismiss

Defendants move to dismiss MADA's complaint pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., on four alternative grounds: (1) MADA's claims are barred by

sovereign immunity, (2) MADA lacks standing, (3) MADA's claims are not ripe for judicial review, and (4) MADA fails to state a claim on which relief can be granted.

A defendant may challenge a plaintiff's complaint for lack of subject-matter jurisdiction either on its face or on the factual truthfulness of its averments. *See* Fed. R. Civ. P. 12(b)(1); *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). In a facial challenge, as presented here, the nonmoving party "receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).

Under Rule 12(b)(6), a complaint must be dismissed if it fails to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must allege sufficient facts that, when accepted as true, state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When determining whether the complaint states such a claim, a district court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). The factual allegations need not be detailed, but they must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A plaintiff must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555. Legal conclusions that are couched as factual allegations may be disregarded by the district court. *See Iqbal*, 556 U.S. at 678–79.

Because sovereign immunity, standing, and ripeness implicate the Court's subject-matter jurisdiction, the Court addresses arguments pertaining to these matters first.

**A.     Sovereign Immunity**

Defendants contend that MADA's claims are barred because Defendants are entitled to sovereign immunity. Sovereign immunity is a threshold issue, as it implicates a federal court's subject-matter jurisdiction. *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999).

The Eleventh Amendment to the United States Constitution entitles states to sovereign immunity, which prevents any federal court from exercising jurisdiction over a lawsuit against a state. U.S. Const. amend. XI; *accord Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). Sovereign immunity bars a plaintiff from suing a state *or* its agencies in federal court absent consent or congressional abrogation of immunity. *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007); *Doe v. Nebraska*, 345 F.3d 593, 597 (8th Cir. 2003). The MPCA is an agency of the State of Minnesota, *see* Minn. Stat. § 114D.25, and Minnesota has not consented to be sued in federal court. Indeed, MADA does not dispute that the State of Minnesota and the MPCA are entitled to sovereign immunity.[1] Accordingly, the Court lacks subject-matter jurisdiction over MADA's claims as asserted against the State of Minnesota and the MPCA.

---

[1]     In its memorandum of law, MADA asserts that it "is not suing the MPCA or the state of Minnesota." Contrary to this assertion, MADA's complaint separately references both "Defendant MPCA" and "Defendant Laura Bishop," and the complaint provides that the State of Minnesota "is also a defendant in this matter." As such, the Court construes MADA's position as a concession that Defendants State of Minnesota and MPCA should be dismissed from this action.

7

MADA also names Bishop, in her official capacity as the Commissioner of the MPCA (Commissioner), as a defendant.  Bishop argues that she, too, is entitled to sovereign immunity.  MADA counters that the *Ex parte Young* doctrine, an exception to sovereign immunity, permits MADA to assert its claims against Bishop.

The Eleventh Amendment bars a plaintiff from suing a state official in her official capacity except for certain claims seeking prospective equitable relief.  *Kentucky v. Graham*, 473 U.S. 159, 165–66, 169 (1985); *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997).  Under the *Ex parte Young* doctrine, "a private party can sue a state officer in [her] official capacity to enjoin a prospective action that would violate federal law."  *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).  "In determining whether this exception applies, a court conducts a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Id.* (internal quotation marks omitted) (alteration in original).  But "[t]he *Ex parte Young* exception only applies against officials 'who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce . . . an unconstitutional act."  *281 Care Comm. v. Arneson*, 766 F.3d 774, 797 (8th Cir. 2014) (quoting *Ex parte Young*, 209 U.S. 123, 156 (1908)).  "The *Ex parte Young* doctrine does not apply when the defendant official has neither enforced nor threated to enforce the statute challenged as unconstitutional."  *Id.* (internal quotation marks omitted).

Typically, the *Ex parte Young* exception to sovereign immunity permits "nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law."  *Va. Office for Prot. &*

*Advoc. v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring).  As such, the *Ex parte Young* doctrine applies "[w]hen enforcement actions are imminent . . . and the moving party lacks the realistic option of violating the law once and raising its federal defenses," because in such circumstances "there is no adequate remedy at law."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

Here, it is undisputed that the Commissioner has not enforced Minnesota's proposed emissions rules.  Those rules have neither been adopted nor taken effect.  MADA cites no legal authority—and the Court's research has found none—in which the *Ex parte Young* doctrine has abrogated a state official's sovereign immunity because that official has engaged in administrative rulemaking as opposed to enforcing or threatening to enforce an existing rule.  At best, MADA alleges that the Commissioner has *implicitly* threatened to enforce the proposed emissions rules when those rules take effect.  But the proposed emissions rules may not ever take effect if California's preemption waiver under the Clean Air Act is not reinstated.  And if the proposed emissions rules *do* take effect, it is undisputed that the rules cannot be *enforced* until several years from now.  Because MADA has not demonstrated that the Commissioner has threatened to commence a civil or criminal enforcement action imminently, the *Ex parte Young* doctrine does not apply.

MADA argues that the Early Action Credit Provision of Minnesota's proposed emissions rules could take effect sooner, possibly within the next six months.  The Early Action Credit Provision permits motor vehicle manufacturers to begin to accrue credits for zero-emission vehicles delivered for sale in Minnesota *before* Minnesota's proposed

emissions rules go into effect. But this provision merely offers incentives to motor vehicle manufacturers that voluntarily take certain actions. The Early Action Credit Provision does not threaten or even authorize civil or criminal enforcement against any person or entity. MADA emphasizes that Defendants' rulemaking documents have referred to the Early Action Credit Provision as an "enforcement mechanism." But that terminology—which, according to Defendants, is a term of art that differentiates the credit system from an emissions "standard"—does not alter the *substance* of the Early Action Credit Provision, the language of which plainly does *not* threaten or authorize civil or criminal enforcement. Because Minnesota's proposed Early Action Credit Provision neither threatens nor authorizes enforcement actions of any kind, the *Ex parte Young* doctrine does not apply.

For these reasons, sovereign immunity bars MADA's claims against Defendants. Therefore, the Court lacks subject-matter jurisdiction over MADA's claims.

## B.    Standing

Defendants also argue that, even if they were not entitled to sovereign immunity, MADA lacks standing, which implicates this Court's subject-matter jurisdiction over MADA's claims. *See Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002). The jurisdiction of federal courts extends only to actual cases or controversies. U.S. Const. art. III, § 2, cl. 1; *accord Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994). To satisfy the case-or-controversy requirement of Article III of the United States Constitution, a plaintiff must establish standing as an "indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *accord Hargis*

*v. Access Cap. Funding, LLC*, 674 F.3d 783, 790 (8th Cir. 2012).  To meet this standing requirement, the plaintiff must (1) have suffered an injury in fact, (2) establish a causal relationship such that the alleged injury is fairly traceable to the defendant's challenged conduct, and (3) show that a favorable decision would redress the injury.  *Lujan*, 504 U.S. at 560–61; *accord Hargis*, 674 F.3d at 790.

MADA is an association rather than an individual plaintiff.  An association can have standing on its own behalf or on behalf of its members.  *See Bowman v. W. Auto Supply Co.*, 985 F.2d 383, 388 (8th Cir. 1993).  An association has standing on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  As to the first element, an association can have standing even if only one member has standing.  *Id.* at 342.  But a member's interest cannot be merely "abstract concern" or "unadorned speculation."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40, 44 (1976).

Defendants contend that MADA lacks standing because MADA has not sufficiently alleged either an injury in fact or a causal relationship between the challenged conduct and the alleged injury.

### 1.    Injury in Fact

To allege an "injury in fact" that confers standing to seek injunctive relief, a plaintiff must face a threat of ongoing or future harm.  *Park v. Forest Serv. of the U.S.*,

205 F.3d 1034, 1037 (8th Cir. 2000).  An injury in fact "must be concrete, particularized, and actual or imminent."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted).  The purpose of the imminence requirement "is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."  *Id.*  (internal quotation marks omitted).  Allegations of a possible future injury are insufficient to confer standing.  *Id.*

In *Clapper*, the Supreme Court of the United States held that the plaintiffs lacked standing because a "speculative chain of possibilities" could not establish an injury in fact based on potential future injuries.  *Id.* at 414.  The plaintiffs sought a declaration that Section 702 of the Foreign Intelligence Surveillance Act of 1978 is unconstitutional and an injunction against surveillance authorized by that section.  *Id.* at 401.  The plaintiffs attempted to establish an injury in fact based on an objectively reasonable likelihood that their communications would be acquired pursuant to the challenged law at some point in the future.  *Id.*  Rejecting that argument, the Supreme Court observed that the plaintiffs' possible future injury depended on a "highly speculative fear" that a lengthy chain of events would occur.  *Id.* at 410.

Here, MADA's complaint alleges two forms of injury.  First, MADA alleges that its members will lose sales if they can stock and sell only vehicles that comply with the California emissions standards that Minnesota seeks to adopt.  Second, MADA alleges that its members will incur costs from stocking increased numbers of zero-emission

vehicles.  MADA also alleges that its members will suffer a competitive disadvantage because dealerships in neighboring states will not be subject to the same restrictions.[2]

To establish standing, MADA must allege an injury that is "imminent" and "*certainly* impending."  *Id.* at 409 (internal quotation marks omitted).  "When a state or local law imposes compliance burdens on those it regulates or controls, and compliance is coerced by the threat of enforcement . . . the controversy is both immediate and real."  *Keller v. City of Fremont*, 719 F.3d 931, 947 (8th Cir. 2013) (internal quotation marks omitted).  But the impact of the regulation must be "direct and immediate," and the plaintiff must "allege an actual, well-founded fear that the law will be enforced against them."  *Id.* (internal quotation marks omitted).

Here, it is undisputed that most of Defendants' proposed emissions rules will not be enforced in a manner that impacts MADA's members, if at all, until more than two years from now.[3]  Indeed, Defendants' proposed emissions rules might never take effect, depending on how the ongoing waiver dispute between California and the EPA is

---

[2]     In its memoranda of law, MADA also argues that its members will lose customer goodwill and sustain reputational harm.  But because neither of these purported harms is alleged in MADA's complaint, the Court need not consider these purported injuries.

[3]     MADA's arguments focus on the timing of the adoption of Defendants' proposed emissions rules and, to a lesser extent, the effective date of those rules.  MADA's focus on adoption and effective dates is misplaced.  To establish Article III standing, the alleged *injury* must be imminent.  Significantly, most of the alleged injuries to MADA's members will not coincide with either the adoption date or the effective date of Defendants' proposed emissions rules, but instead would arise years later when those rules are enforced.  MADA does not dispute that the Clean Air Act imposes a two-year delay between the effective date and the enforcement date of a state's emissions rules.  As such, most of the alleged injuries to MADA's members will not arise until *at least* several years from now, if at all.

resolved.  Even if that dispute is resolved such that California's waiver is reinstated, Defendants' proposed emissions rules must go through multiple additional steps in the administrative rulemaking process before taking effect, followed by a delay in time before the rules are enforced.  By that time, several years in the future, it is possible that other factors relevant to MADA's alleged injuries will have changed, including the applicable federal emissions standards, the applicable California emissions standards, the business relationships between automobile manufacturers and dealerships, and the market for zero-emission vehicles.  Moreover, the resolution of California's waiver dispute could render MADA's preemption theory moot before any anticipated harm befalls MADA's members.  For these reasons, the alleged injuries to MADA's members are neither imminent nor certainly impending, at least with respect to the aspects of Defendants' proposed emissions rules that are contingent on a particular resolution of California's ongoing waiver dispute.

MADA contends, however, that the Early Action Credit Provision of Defendants' proposed emissions rules will cause certain imminent injuries to MADA's members. Because the Early Action Credit Provision is *not* contingent on a resolution of California's waiver dispute, this provision could take effect later this year.  As such, MADA argues, it is undisputed that the effective date of the Early Action Credit Provision could occur much sooner than the effective date of the other portions of Defendants' proposed emissions rules.  But the Early Action Credit Provision must go through at least several more months of administrative rulemaking procedures, including but not limited to public hearings in February, a written comment period that ends in

April, the issuance of an Administrative Law Judge's (ALJ) report in May, and a review by the office of the Governor of Minnesota thereafter.  Any one of these future steps in the administrative rulemaking process could result in additional delays, material revisions to the Early Action Credit Provision, or elimination of the Early Action Credit Provision altogether.  And even if the Early Action Credit Provision takes effect in its currently proposed form, any alleged injuries to MADA's members would also depend on motor vehicle manufacturers voluntarily choosing to seek early-action credits.  As such, the alleged injuries arising from the Early Action Credit Provision are neither imminent nor certainly impending.  The existence of these injuries is remote in time and depends on a lengthy chain of events, the outcome of which remains uncertain.

MADA contends that its members "will not be able to recover [the] losses or the costs of participating in the rulemaking" process.  But this argument is unavailing for at least four reasons.  First, this purported harm is not alleged in the complaint.  Second, MADA offers no substantiation for this purported harm.  Third, MADA has neither alleged nor established that engaging in administrative rulemaking is or can be preempted by federal law—a contention that is contrary to law.  *Cf. Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1481 (2018) (holding that federal law cannot prohibit, through preemption, a state legislative or rulemaking process); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. State Dep't of Env't Conservation*, 17 F.3d 521, 533–34 (2d Cir. 1994) (concluding that New York may adopt preempted emissions standards so long as the state "makes no attempt to enforce" the standards before a preemption waiver has

been obtained).[4]   Fourth, MADA has provided no legal authority—and the Court's research has not identified any—establishing that the cost of participating in an administrative rulemaking process is a redressable harm.  *See Lujan*, 504 U.S. at 560–61 (recognizing that Article III standing requires a plaintiff to show that a favorable decision would redress the alleged injury).

Part of the relief MADA seeks is a declaratory judgment that the mere *adoption* of Defendants' proposed emissions rules will be unlawful, even if the harmful effects of the enforcement of those rules do not occur until later.  "The essential distinction between a declaratory judgment action and an action seeking other relief is that in the former no actual wrong need have been committed or loss have occurred in order to sustain the action."  *County of Mille Lacs v. Benjamin*, 361 F.3d 460, 464 (8th Cir. 2004) (internal quotation marks omitted).  But "[t]he controversy requirement of the Declaratory Judgment Act is synonymous with that of Article III of the Constitution."  *Id.* at 463 (internal quotation marks omitted).  And a plaintiff seeking declaratory relief must demonstrate that the plaintiff has suffered at least a threatened injury.  *See, e.g.*, *id.* at 464 (affirming dismissal of declaratory-judgment action for lack of standing because allegations in the complaint "do not establish an injury in fact" but instead, "[a]t best, . . .

---

[4]     MADA's reliance on *Middle South Energy, Inc. v. Arkansas Public Service Commission*, 772 F.2d 404 (8th Cir. 1985), is misplaced.  At issue in *Middle South Energy* was an injunction preventing quasi-judicial state administrative proceedings that threatened imminent enforcement of state law.  772 F.2d at 413.  The circumstances in *Middle South Energy* are materially distinct from the circumstances in this case, which involve an attempt to enjoin ongoing administrative rulemaking pertaining to yet-to-be-adopted rules, for which no threat of imminent enforcement exists.  Moreover, the Supreme Court subsequently made clear in *Murphy* that federal preemption cannot bar a state from conducting administrative rulemaking.  *See* 138 S. Ct. at 1481.

reflect speculative harms"). Here, for all the reasons addressed above, the injuries that MADA alleges are too speculative and remote to satisfy this standard.

Accordingly, MADA has not alleged an injury in fact sufficient to establish Article III standing.

### 2.    Traceability

Even if any of MADA's alleged injuries were sufficiently imminent and certainly impending, MADA also must demonstrate that the alleged injury is fairly traceable to Defendants' allegedly illegal conduct. *Lujan*, 504 U.S. at 560.

For an injury to be fairly traceable to a defendant's conduct, it must not be the result of "the independent action of some third party not before the court." *Id.* (internal quotation marks omitted). But an alleged injury may be fairly traceable to a defendant if the injury is "produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). As such, traceability may be established based on "the predictable effect of Government action on the decisions of third parties" as opposed to "mere speculation about the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

Here, the injuries MADA alleges are predicated on the independent decisions of multiple third parties. First, the participants in the ongoing administrative rulemaking process—including the ALJ and the Governor of Minnesota—must decide to adopt the proposed emissions rules, including the Early Action Credit Provision, without alterations. Second, *if* the Early Action Credit Provision is adopted without alterations, motor vehicle manufacturers must voluntarily choose to seek early-action credits by

increasing their delivery of zero-emission vehicles to dealerships in Minnesota.[5]  Third, the dealerships must choose to accept additional zero-emission vehicles and, in turn, the motor vehicle manufacturers must choose not to reimburse or otherwise offset any additional costs or burdens that such deliveries might impose on the dealerships.  These decisions may depend in part on the business relationships and negotiations between individual manufacturers and individual dealerships, including existing agreements and possible modifications to those agreements.  Fourth, whether the remainder of Minnesota's proposed emissions rules ever take effect will depend on the reinstatement of California's preemption waiver, which will depend on decisions made by numerous third parties, including the judges of the D.C. Circuit and officials at the EPA and NHTSA.  Fifth, MADA's alleged injuries assume that, in several years' time, Minnesota consumers will choose not to purchase the increased volume of zero-emission vehicles.

To be sure, some of the steps in the foregoing chain of third-party decisions might be more predictable than others.  But in its totality, this long chain of decisions does not demonstrate that MADA's alleged injuries will be "the predictable effect" of Defendants'

---

[5]     Although this voluntary decision may be influenced by the incentives offered by the Early Action Credit Provision, motor vehicle manufacturers are under no risk of civil or criminal penalty for deciding *not* to seek early-action credits, nor are manufacturers guaranteed to reap any benefit if they do, given that Minnesota's proposed emissions rules might never take effect.  As such, the incentives of the Early Action Credit Provision do not clearly produce a determinative or coercive effect on the actions of motor vehicle manufacturers.  *Contra Dep't of Commerce*, 139 S. Ct. at 2566 (concluding that plaintiffs had satisfied their burden by showing, through historical evidence, that third parties were likely to act in predictable ways to the challenged government action); *Bennett*, 520 U.S. at 170 (concluding that the risk of civil and criminal penalties created a coercive effect on third parties to take action that was ostensibly optional).

conduct as opposed to "mere speculation about the decisions of third parties." *Id.* As such, MADA's alleged injuries are not fairly traceable to Defendants' conduct.

In summary, MADA has not alleged either an injury in fact or that any alleged injury is fairly traceable to Defendants' conduct. Accordingly, MADA lacks Article III standing and, in turn, this Court lacks subject-matter jurisdiction over MADA's claims.

### C.     Ripeness

Defendants also argue that this Court lacks subject-matter jurisdiction because MADA's claims are not ripe for judicial review.

"Standing and ripeness are sometimes closely related" and, when assessing ripeness, courts "focus on whether the case involves contingent future events that may not occur as anticipated, or indeed may not occur at all." *Kennedy v. Ferguson*, 679 F.3d 998, 1001 (8th Cir. 2012) (internal quotation marks omitted); *accord Pub. Water Supply Dist. No. 10 v. City of Peculiar*, 345 F.3d 570, 573 (8th Cir. 2003) (providing that a "case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities"). "The doctrine of ripeness is basically a matter of timing, which requires (1) a sufficiently concrete case or controversy within the meaning of Article III of the Constitution, and also, (2) prudential considerations must justify the present exercise of judicial power." *Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1050 (8th Cir. 1996) (internal quotation marks omitted). When a plaintiff seeks a declaratory judgment, "there must exist a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (internal quotation marks omitted).

CASE 0:21-cv-00053-WMW-ECW   Doc. 48   Filed 02/17/21   Page 20 of 22

The ripeness inquiry requires a court to examine "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000) (internal quotation marks omitted).   In the administrative context, when determining whether an issue is fit for judicial review, courts may consider whether the issues are based on final agency action and whether the controversy has a direct and immediate impact on the plaintiff's business.  *Lane v. U.S. Dep't of Agric.*, 187 F.3d 793, 795 (8th Cir. 1999).

The issues presented in this case are not based on final agency action and do not involve a direct and immediate impact on MADA's members' businesses.  Federal courts "may review final agency rules," but federal courts "do not have authority to review proposed rules."  *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015).  As addressed above, MADA challenges administrative rules that have not been adopted, have not taken effect, and have not been enforced.  These rules will not be enforced, if at all, until several years from now.  Moreover, as also addressed above, MADA's alleged injuries depend on contingent future events that may not occur as anticipated, if at all, and will not arise for months, if not years.  For these reasons, MADA's challenge to Defendants' proposed emissions rules are not ripe for judicial review.

MADA also challenges the Defendants' ongoing administrative rulemaking process directly.  But federal preemption—the theory on which MADA's entire lawsuit relies—is implicated when "a federal law . . . regulates the conduct of private actors, not the States."  *Murphy*, 138 S. Ct. at 1481.  Because the anticommandeering doctrine

prohibits Congress from dictating what laws or regulations a state may or may not enact, a federal preemption provision cannot prohibit a state from conducting administrative rulemaking. *See id.* This is true even if the proposed rule, if adopted, would be preempted by federal law. *See id.* Thus, Defendants' ongoing administrative rulemaking process is not subject to MADA's challenge.

Accordingly, MADA's claims are not ripe for judicial review. Therefore, the Court lacks subject-matter jurisdiction over MADA's claims.

### D.     Failure to State a Claim

Defendants argue in the alternative that MADA's complaint should be dismissed because MADA fails to state a claim on which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). Because MADA's claims must be dismissed for lack of subject-matter jurisdiction for the reasons addressed above, the Court need not address Defendants' alternative basis for seeking dismissal.

### II.     Motion for Preliminary Injunction and Motion to Intervene

MADA also moves for a preliminary injunction, and the Proposed Intervenors move to intervene as Defendants in this case. In light of the Court's conclusion that MADA's claims must be dismissed for lack of subject-matter jurisdiction, MADA's motion for a preliminary injunction and the Proposed Intervenors' motion to intervene must be denied as moot.

### ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1.      Defendants' motion to dismiss, (Dkt. 28), is **GRANTED**.

2.      Plaintiff's complaint, (Dkt. 1), is **DISMISSED WITHOUT PREJUDICE**
for lack of subject-matter jurisdiction.

3.      Plaintiff's motion for a preliminary injunction, (Dkt. 13), is **DENIED** as
moot.

4.      Proposed Intervenors' motion to intervene, (Dkt. 38), is **DENIED** as moot.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  February 17, 2021                                    s/Wilhelmina M. Wright
                                                             Wilhelmina M. Wright
                                                             United States District Judge